VICKSBURG & MERIDIAN RAILROAD COMPANY *v.* L. A. RAGSDALE.

1. BREACH OF CONDITION SUBSEQUENT.  *Grantor's remedy.*

Ordinarily the remedy for a grantor to regain his estate for breach of condition subsequent is entry or ejectment, not a bill in chancery. But the mere fact that the forfeiture is insisted on will not deprive equity of power to relieve where the remedy at law is not full and complete.

2. SAME.  *Bill to remove cloud on title.*

Where the grantee in a deed containing a condition subsequent has failed to comply with the terms of the grant, or has abandoned the estate, and the grantor is in possession, the latter may maintain a bill in equity to cancel the deed as a cloud on his title; and on this bill may try the question whether there has been an abandonment or forfeiture of the grant.

3. ESTOPPEL BY CONDUCT.  *Freehold estate.*

Although a party cannot divest himself of a freehold estate by parol, yet he may without writing so conduct himself with reference to it that he will be estopped afterwards to assert a claim thereto; and this doctrine of estoppel is applied without reference to the provisions of the Statute of Frauds.

4. CASE IN JUDGMENT.  *Waiver by grantor of breach of condition subsequent. Estoppel on railroad company to deny authority of its officers.*

R. conveyed to a railroad company twenty-two acres of land, upon condition subsequent that the company should locate its track and depots as specified in the deed.  Afterwards it was agreed by parol between R. and the president and chief engineer of the company that the track and depots should be located differently, that the company should reconvey to R. the twenty-two acres, and that R. should convey to the company six acres, a part of the twenty-two.  The six acres were marked off in a map made by the company, as its property, and the track and depots located thereon according to the last agreement.  R. afterwards applied to the president of the company for a reconveyance.  He declined to make it until it was ascertained how much of the twenty-two acres another connecting railroad company might need for depot purposes, stating that then all not so needed would be reconveyed.  He told R., however, to go ahead and make sales of town lots, parts of the property, and the company would convey to his vendees.  Upon the president's death, R. brought this agreement to the notice of his successor, who recognized it, and promised that it should be carried out.  R. laid off town lots on the

sixteen acres, and sold many, which were afterwards improved. The company's officers were aware of these sales, and saw the improvements being made. In a subsequent controversy between R. and the company, the latter asserted its right to the whole twenty-two acres, denying the authority of its president and chief engineer to make the agreement to reconvey, and insisting that it was void, because not in writing. *Held*, that the company was estopped to deny the authority of its officers, and that R. was entitled to all the land, except the six acres. *Held*, also, that R., by the agreement aforesaid, had waived, as to the six acres, his right to a forfeiture for non-compliance by the company with the condition in the deed.

5. SAME. *Excuse for non-compliance with agreement. Substantial compliance.*

In the second agreement above mentioned, made in 1860, no time was fixed within which the depots were to be built; and, it appearing that the company's resources were much crippled by the war, and at its close the road-bed was in bad condition, the failure to build the depots up to the filing of this bill in 1867 did not forfeit its right to the six acres. The discharge of passengers by this and the connecting companies on the spot where the passenger depot was agreed to be built gave R., who had put a hotel there, the substantial benefit of the agreement. But, notwithstanding the circumstances affording an excuse so far for non-compliance, the court dismissed the bill, without prejudice as to the six acres.

6. CHANCERY. *Relief where less proved than claimed.*

Relief will be decreed in equity to the extent called for by the evidence, although greater relief is claimed in the bill. Hence, where the bill alleges that the defendant has abandoned his claim to twenty-two acres conveyed to him by the complainant on condition subsequent, the latter may be relieved as to sixteen acres, if the proof is that the abandonment was to that extent only.

APPEAL from the Chancery Court of Hinds County.

Hon. E. W. CABANISS, Chancellor.

*W. L. Nugent,* for the appellant, argued the case orally, and filed a brief, making the following points : —

1. The bill cannot be maintained to enforce a forfeiture of the grantee's rights for breach of condition, because equity never lends its aid to enforce a forfeiture, 2 Story Eq. Jur. § 1319; 4 Kent Com. 130; *Livingston* v. *Tompkins*, 4 Johns. Ch. 415; nor on the ground that the objects of the grant have not been accomplished, for the bill shows that these objects rest in extrinsic parol agreements. There is no fraud,

accident, mistake or undue advantage.  As a proceeding to remove clouds from title, it cannot be maintained.  *Huntington* v. *Allen*, 44 Miss. 662.

2. The nature of the deed conveying the land to the railroad company, being an absolute grant in fee with a covenant or condition subsequent to secure the location of the railroad at the specified crossing, without limit as to time of performance, there could be no such thing as the destruction of the estate for failure so to locate it.  *Anthony* v. *Stephens*, 46 Ga. 241 ; 2 Greenl. Cruise on Real Prop. 730 ; 4 Cruise Dig. 193 ; 2 id. 2, 38.  If held to be a condition subsequent, no entry for breach is alleged or proved, 2 Cruise Dig. 33, § 25 ; and the appellee having made its performance impossible by erecting buildings on the proposed track of the road, the estate became absolute, 2 Cruise Dig. 28, § 32, § 2 ; *Jones* v. *Walker*, 13 B. Mon. 163 ; *Lamb* v. *Clark*, 29 Vt. 273.  He has waived his right to insist upon the breach, by seeking a reconveyance of the land, under an agreement *after* the location of the road at a point other than that stipulated.  *Chalker* v. *Chalker*, 1 Conn. 79 ; 2 N. H. 163 ; 3 Cow. 220 ; 8 Pick. 284 ; 41 Penn. St. 349.

3. No breach has occurred.  The depot of the Alabama road, located in part on their own right of way, prevents the intersection at the exact point indicated, except by a switch. That has been done.  Ragsdale's object was to increase the value of his property.  That has been accomplished : when he made the grant it was worth $50,000 ; to-day its value is $300,000, exclusive of improvements, and he has realized $50,000 by sales.

4. The board of directors did not have power to surrender the railroad property, nor could the president so dispose of it. Smedes, at any rate, could not bind the company by his acts. The maxim, *delegata potestas non potest delegare*, applies to corporate agencies.  Story on Agency, § 13 ; *Shankland* v. *Washington*, 5 Pet. 390.  An individual officer cannot bind the corporation.  *Brooklyn Co.* v. *Slaughter*, 33 Ind. 185 ; *Adriance* v. *Roome*, 52 Barb. 399 ; 3 S. & M. 609 ; 22 Wis. 194 ; *Hayden* v. *Middlesex Co.*, 10 Mass. 397 ; *Munn* v. *Commission Co.*, 15 Johns. 44 ; 1 S. & M. 17 ; 3 S. & M. 609.  Where the agent's

acts are contrary to the interest and duty of the corporation, there is no presumption of authority.   *Custar* v. *Titusville Co.*, 63 Penn. St. 381; *Robinson* v. *Pittsburg Railroad*, 32 Penn. St. 339; *Gaff* v. *Steubenville Railroad*, 31 Penn. St. 589; *Tippetts* v. *Walker*, 4 Mass. 597; *Dispatch Line* v. *Bellamy Co.*, 12 N. H. 226; 12 Mass. 237; 15 Pick. 302; *Gibbs* v. *Bailey*, 1 Foster (N. H.), 149.

5. The performance of the condition having been prevented by the war, no forfeiture could take place.   *United States* v. *Fremont*, 17 How. 560; *United States* v. *Reading*, 18 How. 1. The bill was filed in 1867, too soon after the close of hostilities to justify complaint.

*J. Z. George*, for the appellee, made an oral argument.

*Harris & George*, on the same side.

1. The rule which prohibits courts of equity from lending their aid to cases of forfeiture had its origin in the common-law principle, now in America almost universally a constitutional rule, that no person shall be compelled to make an answer or discovery which may criminate himself.   *Smith* v. *Read*, 1 Atk. 526; *East India Co.* v. *Campbell*, 1 Ves. Sen. 246; *Livingston* v. *Harris*, 3 Paige Ch. 528; *Sharp* v. *Carter*, 3 P. Wms. 375; *Earl of Suffolk* v. *Green*, 1 Atk. 450; *Chetwynd* v. *Lindon*, 2 Ves. Sen. 450; *Bird* v. *Hardwicke*, 1 Vern. 109; *Chauncey* v. *Tahourden*, 2 Atk. 393.   At an early day the distinction was taken, that, if the defendant was bound by his contract to make the discovery, it was no objection to it that a forfeiture ensued.   *South Sea Co.* v. *Bumsted*, 1 Eq. Cas. Abr. 77, par. 16; *African Co.* v. *Parish*, 2 Vern. 244; *East India Co.* v. *Neave*, 5 Ves. 173; *Green* v. *Weaver*, 1 Sim. 404. Ordinarily a court of equity would not enforce a forfeiture or a penalty of any kind, because in nearly every instance the remedy is ample at law.   But when the remedy at law is inadequate, or unsuited to the circumstances of the case, or when the complainant's title is purely equitable, so that he could not sue at law, and there is nothing inequitable in claiming the forfeiture, and it arises by the contract of the parties, — there is neither authority nor sound reason for refusing relief.

2. This is not a bill to enforce a forfeiture, or to divest an

estate already vested. Conceding that this is a condition sub-
sequent, the forfeiture has already been consummated, the
title of the railroad company divested; and the relief asked
and granted is, that the deeds and contracts which have be-
come *functus officio* shall be delivered up and cancelled. The
grantor is in possession, and needs no aid from any court to
recover the forfeited estate. But an outstanding deed made
by him, under which the grantee asserts rights, constitutes a
cloud on his title, and he is entitled to a remedy against that,
which a court of equity alone can give. The code of 1857,
p. 541, art. 8, authorizes the bill. The statute makes no ex-
ception : the grant of power therein is broad, and without
restriction as to the cause of the invalidity of the deed which
makes the cloud.

3. Another reason why Ragsdale must come into equity
is that the bill shows that he was the owner of the land
granted, and that he conveyed and caused it to be conveyed to
the railroad company. The exhibit further shows that there
are four or five grantors. The bill does not show precisely
the nature of Ragsdale's title ; but as it states that Ragsdale
was the owner, and shows also that others joined with him in
the conveyance, being caused by him to do so, and that the
conveyance was upon a contract made by Ragsdale and the
company alone, it may readily be inferred, as is shown in
the proof, that Ragsdale was then an owner of only an equity
in the lands, and therefore it was necessary for those holding
the legal title to join with him in the conveyance. This
being so, Ragsdale had no remedy at law, even if he had been
out of possession ; and this of itself is a distinct ground for
equity jurisdiction.

4. Another ground upon which equity will give relief, in
this case, is that the bill and the proof show a case in which
the complainant would be entitled to a rescission of the con-
tract, even if there were no condition in the deed, upon the
ground of the subsequent failure of the railroad company to
comply with its promises, representations and agreements, in
relation to the location of said road. It is not necessary to a
rescission that these representations and promises were inten-
tionally fraudulent. It is sufficient if it appears that they

were a material inducement to the contract of the complainant, and that the defendant has subsequently failed to comply with them, whereby the complainant has been induced to part with his title and property, without deriving therefrom the consideration and advantage which the defendant gave him ground to expect.   There can be no equity in the defendant's retaining what it never paid for, and what it procured upon a promise never complied with, or a representation which turned out, by its fault, to be delusive.   *Brewer* v. *Harris*, 2 S. & M. 84; *Anderson* v. *Hill*, 12 S. & M. 679; *Townsend* v. *Hurst*, 37 Miss. 679; *Brandon* v. *Brandon*, 46 Miss. 222; *Quick* v. *Stuyvesant*, 2 Paige Ch. 84.

*W. P. Harris*, on the same side, made an oral argument.

SIMRALL, C. J., delivered the opinion of the court.

In 1857, the Southern Railroad Company (now the Vicksburg and Meridian Railroad Company) was prosecuting the construction of its road eastward from Brandon; and anticipated making a junction with the Mobile and Ohio Railroad, within the course of three years or thereabouts.   At the same time, the North-eastern and South-western Alabama Railroad Company were constructing a line of road, pointing to a western terminus at the same place.   L. A. Ragsdale, who had become a large proprietor of land at or near the point of the projected junction and intersection, was desirous of reaping the advantages of the enhanced value of his property consequent upon bringing together these roads on his land.   As an inducement to the several companies, he made the proposal contained in paper Exhibit A to his bill, offering to donate to each about twenty-seven acres of land. The purpose, as respects the North-eastern and South-western Company, was, that it should adopt the land " as the depot site for the south-west terminus of its road."   The purpose for which the offer was made to the Vicksburg and Meridian Company is thus expressed: " I do further agree to deed to the Southern Railroad Company a strip " (describing it) " whenever the said Southern Railroad Company shall likewise *in the same manner* adopt such strip as the north-eastern or eastern terminus of its road."   Ragsdale agreed that the

length and position of the depot sites should be arranged as the companies might see fit, provided they all were parallel with each other, and provided that one acre of ground should be set apart for his exclusive use, which should be opposite the eighty-one acres to be granted to the companies. This paper is dated Oct. 12, 1857. On the same day he submitted another proposal to the companies, to make joint purchases of land, and a loan of money by them to him, which was rejected. On March 5, 1858, Ragsdale conveyed by deed twenty-two acres and a fraction, part of that described in Paper A., to the Southern Railroad Company. Immediately following the covenants of warranty are these words: " It is, however, expressly understood that the above conveyance is made for a location of the Southern Railroad at the crossing of the Southern Railroad with the Mobile and Ohio Railroad, not differing at right angles from the location made by Haupt in 1853 more than one hundred and twenty-five feet."

The substance of the case stated in the bill is, that the propositions embodied in Paper A and the conveyance in Exhibit C were made by Ragsdale, for the purpose of securing the location of the terminus of the Southern Railroad at the place therein·mentioned. Ragsdale, the complainant, was the owner of adjacent lands, and was desirous that the future city should develop on his domains, rather than on those of rival proprietors. He also contemplated the erection of a hotel convenient to the passenger depot, for the entertainment of travellers. As before stated, the offer in Paper A was addressed to the three companies; but was accepted only by the Southern Railroad Company, to which subsequently most of the land offered in Exhibit A was conveyed by the deed Exhibit C. The complainant alleges that the company did not enter upon the land and enjoy it for the purpose mentioned in the grant, but abandoned it; and the complainant was notified by the president of the company, Mr. Smedes, that a final location of the depot could not be made until a co-operative arrangement was made with the Alabama Company; that the Southern Railroad Company would only want so much of the land which·he had conveyed to them as would be necessary for railroad purposes, that he might go on and sell

off the property; and, when the depot was finally located, a reconveyance would be made of all that was not needed. In lieu of this reconveyance, Ragsdale was to give them other six acres. Finally the Southern Railroad Company, in conjunction with the Mobile and Ohio Railroad Company, selected a place for a passenger depot contiguous to his hotel, the title to which was in him, and which he was required to convey, and did convey reluctantly. Ragsdale alleges that he has continued in possession of the land embraced in Paper A and the Conveyance C; and that the non-performance by the railroad company of their contract has entailed very heavy losses on him, which he particularizes in his bill.

The railroad company demurred to the bill on two grounds: First, that the Chancery Court has no jurisdiction; second, that a court of law has full and complete jurisdiction. The demurrer was overruled.

The answer of the company admits its intention, in 1857, to intersect the Mobile and Ohio Railroad at or near Meridian, and that Ragsdale submitted the propositions in A and B to the several companies; but denies that they were dependent the one on the other, to be accepted or rejected as a whole. Nor was it necessary for all the companies to accept, in order to make them or either of them obligatory. The respondent accepted the offer in Paper A, but rejected B, because not disposed, nor competent to engage in a large land speculation. The respondent's board have complied with the terms of the proposal as to the terminus of their road, and have adopted the same. They have made their location within the limits prescribed in the deed Exhibit C, and that is the point of their crossing or intersection with the Mobile and Ohio Road. The answer denies that the respondent or its agent held out false inducements to Ragsdale as to the location of his hotel, and denies that it abandoned the grant in A; but avers that, under that proposal, the respondent, Ragsdale and the Alabama Company were endeavoring to effect an arrangement satisfactory to all parties, for the location of a joint depot, but failed; and that thereupon Ragsdale proposed, and the respondent accepted, the grant in deed Exhibit C. The writing A did not bind the Southern Railroad Company and the Selma Rail-

road Company to erect a joint depot, but only obliged them to intersect the Mobile and Ohio Road within certain limits. The respondent proposed to build their depot at a certain point of the long strip donated; but the Selma Company preferred to build their depot off the strip. Ragsdale built his hotel, to induce the respondent to make the intersection at the point he desired. Neither Smedes, Emanuel or Wadley had authority to surrender any of the rights of the company, nor have their acts been ratified by its board of managers. The conduct of the company has not been vacillating touching the location of a passenger depot. During the war, it used temporarily the depot of the Mobile and Ohio Company, a short distance below the point fixed for the permanent location. After the war, it arranged with the Alabama and Mobile and Ohio Companies in the limits described by the respondent and Ragsdale, as set forth in Exhibits 4 and 5 to the answer. The respondent has complied with all the conditions of the grant. It was disclosed in the answer that the company had included the land in Exhibits A and C in a mortgage or trust deed for its creditors. By agreement the trustees were permitted to become parties, and the answer was to have also the office of a cross-bill.

The questions for solution are two: First, Was the Chancellor right in overruling the demurrer to the bill? second, Is the final decree right on the pleadings and evidence?

The grounds of the demurrer are that a court of chancery has no jurisdiction, but that a court of law has. To maintain that proposition, it is said that the writing A and the deed Exhibit C are upon a condition subsequent, or upon a mere covenant that the land granted shall be put to a particular use. If the former be the true interpretation of the instrument, then it is insisted that the only redress of Ragsdale would be to enter for condition broken, or, by what in this country would be an equivalent act, claim the property for that reason by suit in ejectment; if the latter, his remedy would be damages, in an action on the covenant for its breach. This point was not seriously pressed.

Conceding that the grant was upon condition subsequent, ordinarily a court of equity would decline to decree a forfeit-

ure of the estate for condition broken. The doctrine on that subject was examined, and correctly stated we think, in *Memphis & Charleston Railroad* v. *Neighbors*, 51 Miss. 412. In such grants, there remains in the grantor a " bare possibility of reverter " on condition broken, of which he may avail or not at his election. The estate has passed and vested in the grantee, subject, however, to be divested by the grantor or his heirs, by entry, or an equivalent act, whereby he or they are restored to his former or original estate, and may recover possession in a court of law. The remedy at law is full, adequate and complete. The grantor, being fully restored to his original *legal* estate, has no occasion to go into a court of chancery to recover the property. Besides, a court of equity will decline to entertain a bill for the recovery of an estate where the right is founded purely upon a forfeiture. But if the complaining party has an unquestioned right to the property, and for any cause has no remedy at law, another principle, which lies at the foundation of all chancery jurisdiction, asserts itself; and that is, that it will relieve in every meritorious case if the court of law, by reason of its inflexible rules, cannot. In many instances the inquiry is, not whether there may not be redress at law, but whether that court is able to give full and complete remedy.

If Ragsdale were asserting a reclamation of the estate, which he had granted to the Southern Railroad Company upon the naked ground of the breach of a condition subsequent, we should be compelled by the authorities to declare that he had brought his plaint in the wrong court. He alleges, however, that the Southern Railroad Company did not enter upon and occupy the land, but that he has remained in the possession since the date of the grant; that Smedes, its president, intrusted with the duty of making a final location of the depot, authorized him to sell off lots in the premises embraced in instruments A and B; that he did make many sales; and that purchasers have made valuable improvements. If these allegations be true (and they must be so accepted on demurrer), it were absurd to say that he must make demand on himself for the restoration of property in his own possession, or that he could be both plaintiff and defendant in the

action of ejectment. The grant was made to be utilized as the terminal point of the road. At its date an actual location had not been made. The inducement that actuated the grantor was that this rural property, fields and forest, would become urban lots,— the site of a flourishing town, that would grow up around these terminal and intersecting railroads. There would be no occasion to appropriate the land until entered upon for railroad uses. That would happen in 1860 or 1861, when the junction would be made with the Mobile and Ohio Road.

The bill avers that the company never did enter upon and use the land for the purpose granted; but that it abandoned the grant, made its junction with the Mobile and Ohio Road at another point, and built its depot on ground obtained from that company.

We are of opinion that a court of chancery has jurisdiction, on the case made in the bill, to displace and cancel the instruments, on the grounds, first, that the company never entered upon the lands and used them for the purposes contemplated; second, that Ragsdale and his assignees have been in the continuous possession, and therefore an action at law to test his title to the property would not lie; third, that the company abandoned whatever claim or right it had. We announce this conclusion, although the estate in the railroad company might be construed to be on condition subsequent. To hold otherwise would deny to the complainant an opportunity to test his right to the property, and displace the instruments which becloud it. For it could not be denied, that, after a party has established his right at law, a court of chancery would cancel the evidence of title in his grantee. We think the demurrer was properly overruled.

The issue made by the answer is, whether the Vicksburg and Meridian Railroad Company have or not abandoned or forfeited all the rights assured to them by the instruments set forth in Exhibits A and B. This includes (for the purposes of the case on the merits) any minor heads into which the subject may be divided. Ragsdale alleges in his bill that the offers made in the writings A and B, to bind him, required the acceptance of the three companies; and that Sandford, through

whom the papers were to be presented, was instructed to so notify the companies. One of the companies accepted the offer in Exhibit A. It is manifest, on the face of that writing, that the three parcels of land were tendered to the companies, so as to bring their depots together, and as affording accommodations of that sort. Ragsdale disclaimed insisting upon any other restriction than that they should be built parallel to each other ; and that he should retain one acre opposite the passenger depot for his own use, to be located by the engineers, as shown, for the site of a hotel. The plan could not be completely carried out, unless all the companies accepted. There is plausibility and force in the complainant's allegation that he would not be bound, unless all of them agreed to the terms.

The deed Exhibit C is dated the 5th of March, 1858, about twelve months after the date of Exhibit A, and embraces the same land except about five acres, the part omitted being on the eastern end of the parcel, to which Ragsdale did not have title. Whether the deed was intended to be in execution of the offer made in A, inasmuch as it conveyed all the land that Ragsdale owned, or whether it was a new and independent arrangement, is left in doubt. An exhibit to the deposition of Dr. Emanuel, president, gives countenance to the latter theory. On the 19th of March, 1858, Dr. Emanuel communicated to the board of managers that Vosberg, the engineer, had agreed with the property owners, *as to the precise line of the track* up to the crossing with the Mobile and Ohio Road, and had accepted the deed (Exhibit C) donating land without restriction as to its use, and that Vosberg requested the board to ratify his act. The board, however, neither approved nor disapproved. Dr. Emanuel in his communication stated that Vosberg had accepted the deed without restriction as to the use of the property. The deed, however, does contain a stipulation on that subject. The subsequent conduct of the board indicates that the company did not feel bound by the location which Vosberg had made ; for the final and definite location was made afterwards, by Smedes, and Wadley chief engineer. In what year this occurred the witnesses are not agreed. Crooker fixes it in 1860 ; and he, from his

participation in the work, is probably correct.  That location began at a point on the Haupt survey about two thousand feet from the Mobile and Ohio Road, and about three-fourths of a mile west of Meridian, by a deflection in a southerly direction, describing a curve, until it came to the Mobile and Ohio Road.  Fleming, chief engineer and superintendent of the Mobile and Ohio Road, Smedes, president, and Wadley, chief engineer, of the Southern Railroad Company, participated in the negotiations and the final arrangement.  Ragsdale, as a land-owner deeply interested in the subject, participated in the counsels, and heartily consented to the conclusions.

The road was to be located as just described.  The Mobile and Ohio Railroad Company were to donate or sell for a nominal consideration to the Southern Railroad Company ten acres of land for depot purposes.  Ragsdale was to give six acres immediately east of and adjoining the ten-acre lot to the same company; which was to reconvey to him all the land previously donated by him to the company.  Immediately after the parties had thus agreed, Crooker, a subordinate of Wadley (and present when the negotiations were going on), under direction of Wadley, made a map, showing the route of the road, the contemplated depot sites, and the parcels of land, to be donated to the Southern Railroad Company.  This map is an exhibit to Crooker's deposition.  The exact boundaries of the ten and six acre lots are defined.  The six acres extend east, the north and south lines being parallel, the latter abutting on the right of way of the Mobile and Ohio Road.  The Southern Railroad Company would thus acquire about sixteen acres, in a body, for its uses, over part of which its road would be built, until it entered upon the right of way of the Mobile and Ohio Road, and formed a junction with it.  Ragsdale states in his deposition that Wadley represented to Smedes, that the land originally intended for the depot site was not suitable, and that it should be moved farther south, on land belonging to the Mobile and Ohio Company.  It had all along been desired by the Southern Railroad Company and by Ragsdale that the Alabama Company would unite in a common or closely contiguous depot.  That company took no part in the arrangement we have been considering, but subsequently located its

depot at a point about forty-two feet east of the point designated on the map as site of "joint passenger depot," on land purchased from Ragsdale.

Ragsdale exhibited great anxiety that the company should make the reconveyance as had been agreed. He made several applications to Smedes for the deed. Smedes postponed compliance, as his letters show, in the hope that the Alabama Company would finally agree on the same ground for the site of its terminus and depot; and he did not know how much ground that company might need. Urged in repeated letters, Smedes, under date of Oct. 22, 1860, claiming further postponement, said, "You can make any sale that you design making, with the understanding that we will convey to the parties such of the lands as we may find not needful for railway purposes, as that is the object for which we design using it." After Smedes's death, in 1863, Ragsdale called the attention of Dr. Emanuel, the then president of the company, to Smedes's letters, and also to one written by Wadley the 8th of June, 1863, in reference to the land arrangement, and, as may be inferred from Dr. Emanuel's reply, urging the reconveyance. Dr. Emanuel answered, " That the arrangement should be carried out in good faith, and at the first meeting of the board of managers he should recommend that course." The letter of Wadley referred to contains a recital of the arrangement made in 1859 or 1860, and closes with the expression, " that it is right and just the agreement should be carried out in good faith." Wadley had reported the land in Exhibit C, on account of the cost of grading, as unsuitable for the purpose intended. Smedes concurred in that view. Hence we might expect a new arrangement, such as was finally made.

It is important in this connection to look at the acts of the several parties, induced by this agreement and directly referable to it. The Mobile and Ohio Railroad Company, in performance of its engagement, donated or conveyed for a nominal consideration the ten acres to the Southern Railroad Company. The latter company constructed its road, and made its connection with the Mobile and Ohio Road, on the line selected, and as laid down on Crooker's map. Ragsdale,

with Smedes's consent, went on to sell lots in the territory embraced in Exhibits C and A, but outside of the six-acre lot. His vendees, or many of them, have improved the property, by the erection of expensive houses. If all these things, done on the faith of the agreement, are not irrevocable, some of them are. Nothing, perhaps, requisite to a complete performance remained undone in 1867, when the bill was filed, except the erection of a passenger depot in front of Ragsdale's hotel, and the reconveyance to Ragsdale.

The parties seem to have intended (judging from the language used by most of the witnesses) that Ragsdale should convey the six acres to the Southern Railroad Company. But that ceremonial would have been idle and unnecessary. For these six acres constituted part of the tract of twenty-two acres embraced in the deed Exhibit C, conveyed by Ragsdale to the company. The legal title was in the company, and has abided there ever since. Smedes, who was an eminent lawyer, understood the matter in its true light, as it actually was, for he speaks of the quantity of land to be retained by the company out of that which Ragsdale had deeded to them.

Each of the parties, in the manner and to the extent already stated, have acted on the faith of the agreement; so far as these acts, according to their quality and nature, have efficiency in a court of equity to ratify the agreement, they ought to have force by way of estoppel *in pais*. Rights have grown up, deeply involving others not parties to this suit, which would be complicated and embarrassed, if these litigants could gainsay their acts. Can the agreement be sustained in the state of the pleadings consistently with the doctrines of a court of equity?

The legal title to the entire twenty-two acres conveyed by deed Exhibit C is in the Southern, now Vicksburg and Meridian, Railroad Company. Ragsdale, for certain reasons set forth in his bill, claims that the evidence of that title should be cancelled. He further claims a release from the committal which the acceptance of his offer in Exhibit A may have imposed on him. The defendant corporation denies and contests the relief, or any part of it, which he seeks. It insists on the validity of both instruments, and the full measure of right and

benefit which each bestows, and repudiates the authority of Smedes and Wadley to surrender any part of the property included in those instruments.

We know of no rule of equity which denies relief to a party altogether because he has made a false claim as to a part of it. In so far as he has shown title to relief, to that extent he should be redressed. We are satisfied from the evidence that whatever rights the company acquired under these instruments were abandoned, or intended to be abandoned, in part, by the substituted arrangement of 1859 or 1860.

But the objection is interposed that a freehold title to land cannot be transmitted by a mere verbal agreement. The agument is that the new agreement is not in writing; and how shall the prohibition of the Statute of Frauds be escaped? It is said that the renunciation by Smedes, the president, of right to all the land except the six acres was but a mere declaration; and more than that, the defendant's answer denies his authority thus to bind the company.

There has been developed in the court of chancery the doctrine of equitable estoppel, a beneficent doctrine, which operates for the advancement of justice in proper cases, without deed or record; which takes hold of the conscience of a party, and closes his mouth *now*, because he was silent when it was his duty to speak; and which will not tolerate a denial of his declarations or acts, on the faith of which others have engaged in important transactions. An heir who has received money for his land, sold under a probate decree by the administrator or guardian, is estopped to assert his legal title, unless he puts the parties in their former condition, if that be practicable. *Lee* v. *Gardiner*, 26 Miss. 521; *Kempe* v. *Pintard*, 32 Miss. 324; *Wilie* v. *Brooks*, 45 Miss. 542; *Cowen* v. *Alsop*, 51 Miss. 158; *Dickson* v. *Green*, 24 Miss. 612; *Nixon* v. *Carco*, 28 Miss. 414. One who induces another to buy his paper shall not set up a defence that would be good against the assignor. *Laud* v. *Lacoste*, 5 How. (Miss.) 471; *McMurran* v. *Soria*, 4 How. (Miss.) 154. One who stands by and sees another assert title to his property and sell it, will not be heard to dispute the title of the purchaser, if he remained silent, and did not, when good morals and honesty required it, disclose his right.

These principles have application to the conduct of the defendant corporation. Though it may deny the authority of Smedes, it stood by, year after year, and saw Ragsdale asserting ownership over part of the land, which he had donated, and his vendees erecting costly structures, and enjoying their several premises, yet never once protested that Ragsdale was a usurper, and his vendees were improving property which was not rightfully theirs. The ground was laid off into streets, squares and lots. The sound of the hammer was heard, month after month and year after year, until the vacant ground was covered with houses, and became the theatre of trade and business. If the company, who daily saw these things, during all this time remained silent, and did not so much as protest against them, or notify Ragsdale and his vendees, it would be inequitable and unconscientious to permit it to do so now. A natural person would be put under estoppel in similar circumstances: we cannot sanction a more lenient rule for a corporation. We are satisfied that the defendant is estopped to deny the abandonment of right to all the land except the six acres. That being so, and the complainant and his vendees being in possession, the outstanding legal title ought to be vacated or surrendered. But it is obvious that, for the very reasons which should preclude the defendant from holding title to sixteen of the twenty-two acres, the complainant should be denied relief as to the six acres. There has been no abandonment of that, nor so much as a complaint that it has been misapplied.

We have already said that the grantee of an estate, defeasible on condition subsequent, takes the title, as if no such qualification was attached to it, until the grantor elects to reclaim for non-performance of the condition. The acts manifesting the election, such as entry, continual claim, the action of ejectment, are done *in pais*. They serve, however, to convert the possibility of reverter into a reinvestiture of the original estate. The grantor is clothed upon, as it were, with the complete legal title. But, like other rights to property, it may be barred by the Statute of Limitations, or defeated by estoppel. 4 Kent Com. 138; *Memphis & Charleston Railroad* v. *Neighbors*, 51 Miss. 412. It is upon this latter ground that we have

said that the defendant was estopped to deny the complainant's right to part of the land.

As a grantor who proposes to take advantage of a forfeiture may regain the legal title by an act *in pais*, so in like manner he may waive the forfeiture. The consequence of a non-compliance with the stipulation in the deed of 1858 would be the loss of the estate ; that result, as we have shown, was waived, as to part of the land, by specific agreement. The conduct of Ragsdale, in reference to this part, has been in conformity with that agreement. It was put down on Crooker's map as the property of the company, while all the other land granted by him is not so designated. Ragsdale never assumed to deal with it as urban property, by laying it off into streets, squares and lots. On all the maps subsequent to 1860 these six acres are excluded from streets, squares and lots. From 1860, inclusive, until 1864, in all his communications with the defendant, as manifested in the correspondence, he made no claim to this lot; only insisting upon a restoration of his title to the other land. He states that down to the time of filing his bill he was willing to fulfil his contract by a conveyance of the lot. The freight depot, he was informed by Smedes and Wadley, would not be built on the premises Exhibit C, but on the land obtained from the Mobile and Ohio Company. He was cognizant of the location and erection of the first depot ; and of its replacement by another near the spot, after the first was destroyed, he makes no complaint. He was then aware that such location would benefit the Mobile and Ohio Company by the increase of the value of its lands.

Ragsdale complains that the vacillation of the company in the location of its depot has been injurious to him, and beneficial to the Mobile and Ohio Company as land proprietors. He can justly find fault with the company for its delay in establishing a passenger depot near his hotel. No time was stipulated in which that was to be done. What would be a reasonable time would be determinable by the circumstances. The road was finished in the spring of 1861, the first year of the late war. As proved, the cost of construction about absorbed its means, so much so that it accepted depot accommodations for a while from the Mobile and Ohio Com-

pany. It could hardly be justly insisted that the war, and the military operations near its western terminus, and the hostile movements along its line, did not furnish an excuse from 1861 to 1866. At the close of the war, the road, with the rolling-stock, was in a dilapidated condition, requiring large outlays of money to restore them. The company was poor, and, as we may suppose, must look abroad for resources. The more pressing needs must first be attended to, and afford a reasonable excuse for further delay. There have been delays, but no abandonment.

We do not attach the same import to the transaction in 1866, between these railroad companies, as is assigned to it by the counsel for the appellee. That had relation to an object which had all along been desired by Ragsdale and the Southern Railroad Company, — the establishment of a joint passenger depot. The Alabama Company, which had hitherto held aloof, gave in its adhesion. The place selected was in front of his hotel, and conforms to the arrangement of 1859 or 1860. A proposition was submitted to Ragsdale, that he should donate to the Alabama Company a small strip of land east of the Mobile and Ohio Road, and parallel with it; and that he should make an absolute deed to the Mobile and Ohio Company, in place of a conditional grant, which he had previously made. Ragsdale executed these conveyances. The Southern Railroad Company exacted for itself no new consideration. That a threat or alternative was held out to Ragsdale can have no influence on the matters in litigation in this suit. The gain achieved by him was in bringing the passenger stopping-place of all the roads convenient to his hotel, when neither the Mobile and Ohio Road nor the Alabama Road had previously committed itself on that point.

To sum up our views and conclusions on the whole subject-matter. The Southern Railroad Company did not, prior to 1860, enter upon any of the lands in question ; nor was there occasion so to do. Nor did it commit itself to any particular location of its road, except so far as the deed of 1858 may have done so. But in the adjustment to which we have so often referred, all parties relieved themselves from the stipulation in the deed, and devised a new plan. Whether, there-

fore, the location then fixed upon conformed to that required by the deed; whether it was in relation to the Haupt survey, as stipulated in the deed, or not, — was a matter of no concern. For the reasons already given, the company is precluded or estopped from any benefit or estate in the land, except the six acres. Since Ragsdale and his assignees are equitable owners, and have been continuously and are now in the enjoyment of the same, it is equitable and just that their right should be perfected, by drawing to it the fruitless legal title of the company. But he has failed to show that any of the relief sought has application to the six acres. He had distinctly waived any claim to that land, and in effect consented that the company should enjoy its estate in them. His subsequent conduct, down to within a few months before the bill was filed, was a continuous recognition of the company's right to the property. Moreover, important and irrevocable acts have been done by some of the parties, on the faith of the waiver. The delay in the full accomplishment of all that was to be performed by the company has been accounted for; and the complainant is now, and has been for more than eight years, in the substantial enjoyment of all the benefits contemplated by the plan to which he assented, and more, for all the roads discharge and receive passengers at the door of his hotel.

*Decree reversed, and another directed to be rendered.*

A petition for a reargument was filed by Ragsdale's counsel, in which they insisted that he was entitled to relief as to the whole twenty-two acres, upon the ground that there had been unreasonable delay in building the depots, as stipulated in the agreement of 1860.

The court refused the reargument, but modified the decree so as to dismiss Ragsdale's bill as to the six acres without prejudice.