## INDIANA OIL, GAS & DEVELOPMENT CO. v. McCRORY *et al.*

No. 3301.    Opinion Filed May 12, 1914.

(140 Pac. 610.)

1. **MINES AND MINERALS**—Oil and Gas Lease—Construction—Implied Covenant. A lease which grants "all the oil and gas" under the leased land, together with the right to enter "at all times" for the purpose of "drilling and operating" to erect and maintain structures, pipe lines, and machinery necessary for the "production and transportation" of oil and gas, and to use sufficient water, oil, and gas to run the necessary engines for the "prosecution of said business," which reserves to the lessor substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which shows that the promise of these royalties was the controlling inducement to the grant, and which, while expressly requiring that drilling commence within 90 days from the date of said lease, did not expressly define the measure of diligence to be exercised in the work of development and production after the expiration of that period, contains a covenant by the lessee, arising by necessary implication from the nature of the lease and the other stipulations therein contained, that, if during the term of the lease oil and gas, one or both, are found in paying quantities, the work of development and production shall be continued with reasonable diligence; that is, along such lines as will be reasonably calculated to make the extraction of oil and gas from the leased land of mutual advantage and profit to the lessor and lessee.

2. **SAME**—Diligence in Operation. Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which, or the diligence with which, the operation shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of an operator of ordinary prudence, having regard to the interest of both.

3. **SAME**—Forfeitures—Enforcement in Equity. Because forfeitures are usually harsh and oppressive, and because they can ordinarily be enforced at law, courts of equity generally refuse to aid in their enforcement; but the rule is not absolute or inflexible. Its influence and operation do not extend beyond the reason which underlies it, and in cases otherwise cognizable in equity there is no insuperable objection to the enforcement of a forfeiture in a court of equity when that is more consonant with the principles of right, justice, and morality than to withhold equitable relief.

4.    **SAME.** A court of equity will decree a forfeiture of an oil and gas lease on account of a breach of an implied covenant to diligently operate and develop the property when such forfeiture will effectuate justice. The granting of such relief depends upon the facts and circumstances surrounding each particular case.

5.    **SAME—Cancellation — Conditions Precedent.** A lessor invoking the jurisdiction of a court of equity to cancel and rescind a lease for breach of an implied covenant must come into court with "clean hands," and must act with reasonable diligence after the discovery of his right to the forfeiture on account of such breach.

6.    **SAME—Damages.** In a suit to cancel an oil and gas lease, the court should not decree damages where the measure thereof is uncertain, vague, and indefinite.

(Syllabus by Galbraith, C.)

*Error from District Court, Okmulgee County; Wade S. Stanfield, Judge.*

Action by John J. McCrory against the Indiana Oil, Gas & Development Company and others. Judgment for plaintiff, and the defendant named brings error. Reversed.

*Chas. W. Grimes, Harlan Read,* and *Davidson & Williams,* for plaintiff in error.

*Chas. B. McCrory, Geo. A. Johns,* and *Chas. Eichenauer,* for defendants in error.

Opinion by GALBRAITH, C. On the 17th day of March, 1906, John J. McCrory, as owner of the land, executed an oil and gas lease to S. P. Elzey, in words and figures following:

"Agreement, made and entered into the 17th day of March, A. D. 1906, by and between J. J. McCrory, of Morris, Indian Territory, party of the first part, and S. P. Elzey, party of the second part.

"Witnesseth, that the said party of the first part, for and in consideration of the sum of five dollars per acre in hand well and truly paid by the said party of the second part, the receipt of which is acknowledged, and of the covenants and agreements hereinafter contained on the part of the said party of the second part, to be paid, kept, and performed, hereby grant, demise, lease, and let unto the said party of the second part, their heirs or assigns, for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines, steam, water, gas, and

shackle lines to and from adjoining land, and of building tanks, stations, and structures thereon to take care of said products, with the right of going in, upon, over, and across said land for the purpose of operating the same, also with the right to sub-divide and release the same or any part thereof, all of the following described tracts of land situate in the Creek Nation, and within the Indian Territory, to wit: The west half of the north-east quarter and the northeast quarter of the northeast quarter of section twenty-eight, township thirteen north, range fourteen east of the Indian meridian, and containing one hundred and twenty acres, more or less.

"It is agreed, that this lease shall remain in force for the term of fifteen years from this date, and as long thereafter as oil and gas, or either of them, is produced therefrom by the party of the second part, their heirs or assigns.

"In consideration of the premises, the said party of the second part covenants and agrees:

"First. To deliver to the credit of the first party, his heirs or assigns, free of cost, in pipe lines to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises.

"Second. To pay to the first party, his heirs or assigns, one hundred dollars ($100.00) per year for the gas from each and every gas well drilled on said premises, the product from which is marketed and sold off the premises, said payment to be made on each well within sixty days after commencing to use the gas therefrom, as aforesaid, and to be paid yearly thereafter while the gas from said well is so used. First party to fully use and enjoy said premises for farming purposes, except such parts as may be used by second party for the purposes aforesaid; second party agreeing to locate all wells so as to interfere as little as possible with the cultivated portions of the farm. First party to have the right and privilege of using, at his own risk, suffi-cient gas for one dwelling house on the premises from any gas well found on said described lease, he to make his own connec-tions; and it is agreed that no well shall be drilled within —— feet of the buildings now on the premises without the consent of the first party.

"It is provided, that this lease shall become null and void if a well is not commenced on the premises within ninety (90) days from date.

"It is further agreed, that the second party is to have the privilege of using sufficient water, oil, and gas from the premises

to run all necessary machinery, and at any time to remove all buildings, machinery, and fixtures on said premises by the said lessee.

"All the provisions thereof shall extend to the heirs, successors, and assigns of the respective parties hereto.

"In witness whereof, said parties have hereto set their hands and seal the day and year aforesaid."

On the 9th day of May following S. B. Elzey assigned this lease to one C. S. Vaughn, who entered upon the premises about June 1, 1906, and began drilling, which resulted, on June 25th following, in bringing in a gas well of large volume and pressure. On the 26th day of October, 1906, Vaughn assigned the lease to the Indiana Oil, Gas & Development Company. This company, in January, 1907, drilled a second well on the premises, which came in a gas well, also of large volume and pressure. On June 26, 1907, the Indiana Oil, Gas & Development Company sublet the west 80 acres of the 120-acre tract included in the lease to one T. H. Bass, reserving a one-fourth royalty interest therein. Bass entered upon said premises on July 12, 1907, and commenced the drilling of a well at location No. 1, and completed the same on August 3d thereafter. On August 14, 1907, he commenced drilling at location No. 2, which well was finished on September 7th. On September 28th he commenced drilling at location No. 12, which was well No. 3, and finished this on October 14th thereafter. On November 6, 1907, he commenced drilling at location No. 13 and finished the well on November 27th. All of these wells were sunk to a depth of something over 1,600 feet at a cost of about $6,000 each. On November 14, 1907, a receiver was appointed for Bass' interest in this sublease in a suit brought by the Indiana Oil, Gas & Development Company; the receiver taking charge of the property and operating it for 30 days. At the expiration of such time the receiver was discharged, and the property returned to Bass. Bass then executed a trust deed to the property to secure three of his creditors, whose claims amounted to more than $24,000. The trustee named in this deed took charge of the Bass lease in January, 1908, and continued to operate it up until September, 1909, when the property was sold at trustee's sale, and purchased by the

National Supply Company of Kansas. Immediately after this sale the Kansas company took charge of the property and continued to operate it up until the commencement of this action, and were still operating the wells at the trial in May, 1911. On May 15, 1910, the plaintiff, John J. McCrory, instituted suit in the district court of Okmulgee county to cancel the original lease executed to Elzey in March, 1906, and later assigned to the Indiana Oil, Gas & Development Company, and its sublease of the 80 acres to Bass, on account of the careless and negligent drilling and management of the property.

Issues were joined by the several defendants, and the cause was tried to the court. · At the close of the testimony the plaintiff dismissed as to all the defendants except the Indiana Oil, Gas & Development Company and the National Supply Company of Kansas, and disclaimed his right to recover damages against the Kansas company, and asked only the cancellation of the lease against it. The court found the allegations of the bill true, and decreed the cancellation of the lease, and awarded damages in favor of the plaintiff and against the Indiana Oil, Gas & Development Company in the sum of $4,000 for loss of royalties, and $4,000 additional for permanent injury to the land as oil-producing property. To review this judgment, the Indiana Oil, Gas & Development Company has perfected an appeal to this court.

It is admitted that all of the expressed covenants in the lease have been fully complied with, and the rescission and cancellation of the lease is sought on the ground of the violation of an implied covenant to skillfully operate and develop said property.

The court found specifically as follows:

"The court finds no express provision in the lease expressly providing for the forfeiture; but the court does find and holds that the oil lease was executed in consideration of the prospective royalties provided for therein, and the nominal consideration of $1, that oil was struck in valuable and paying quantities in summer and fall of 1907, and that the 40 acres upon which five of the six wells were located was very valuable oil property, and in no respect 'spotted,' and was practically surrounded on the west, south, and east by producing offset wells, and the court holds that said lease contains an implied provision or covenant

for diligent operation, after oil was struck in paying quantities, for the breach of which the lease may be rescinded, set aside, and forfeited."

The court also found, as to the ground of forfeiture:

"That they consisted of a combination of causes, many of which occurred in the fall of 1907, consisting of negligence, delays, carelessness, nonoperation, and want of diligence occurring at different times, and much of which was of a continuous and persistent nature, contributed to the forfeiture and warrants the rescission of the lease as asked for in these proceedings, and, having so occurred, and being of such a character, the court cannot specify a particular time or date, as asked for by the defendant, excepting that all such occurred before the commencement of suit."

Also the court found:

"That the negligent manner in which the wells were drilled and the injurious results therefrom contributed to the cause of the forfeiture and the rescission of the lease as sought by these proceedings."

And, as to fraud, the court found:

"The court does not find that there was an actual fraud practiced upon the plaintiff; but the court does find that there was want of proper care, gross and willful negligence in the drilling, developing, and operating said lease. By 'willful' the court refers more especially to the manner in which wells on location 1 and 2 were, against the advice of experienced drillers and protest of the plaintiff, respectively drilled into the salt water stratum."

The two assignments of error necessary to be considered, are: First, that the judgment of the court is contrary to law; second, that the judgment of the court is contrary to the evidence, and not supported thereby.

The decisions of the courts as to whether or not an oil and gas lease will be canceled by a court of equity for breach of an implied covenant to skillfully operate and develop the property are not harmonious. One line of authorities from courts of high standing hold that the remedy for the breach of such covenant is an action at law for damages, and that equity will not take jurisdiction in the absence of actual fraud; but there is another line of decisions from courts of equal standing holding

to the contrary doctrine. The reason and weight of the argument in support of this latter line of decisions appeals to us, and we find no fault with the court below in holding that equity has jurisdiction and will decree a forfeiture of the lease for violation of such implied covenant. This line of authorities and the ground for such decision is admirably stated by Mr. Justice Van Devanter, sitting as a member of the Eighth Circuit Court of Appeals, in the case of *Brewster v. Lanyon Zinc Co.*, reported in 140 Fed. 801, 77 C. C. A. 213, and the question is discussed as follows:

"With great deference to the able courts which have adopted this view, we think it is not sound. In the absence of some stipulation to that effect, we think an oil and gas lease cannot be said to make the lessee the arbiter of the extent to which, or the diligence with which, the exploration and development shall proceed. The operations contemplated, in the event oil and gas are found in paying quantities, are not to be likened unto a business into which one puts property, money, and labor exclusively his own, the profits and losses in which are of concern only to him, and the conduct of which may be according to his own judgment, however erroneous it may be. By reason of the conditions on which the lease is granted, the lessor retains at least a contingent interest in the oil and gas, to the profitable extraction of which the operations are directed. This interest in the subject of the lease, and the fact that the substantial consideration for the grant lies in the provisions for the payment of royalties in kind and in money on the oil and gas extracted, make the extent to which and the diligence with which the operations are prosecuted of immediate concern to the lessor. If they do not proceed with reasonable diligence, and by reason thereof the oil and gas are diminished or exhausted through the operation of wells on adjoining lands, the lessor loses, not only royalties to which he would otherwise be entitled, but also his contingent interest in the oil and gas which thus passes into the control of others. The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. This is the rule in respect of all other contracts where the time, mode, or quality of performance is not specified, and no reason is perceived why it should not be equally applica-

ble to oil and gas leases. There can therefore be a breach of the covenants for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith. But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market, or demand therefor, or the means of transporting them to market, the extent and result of the operations, if any, on adjacent lands, the character of the natural reservoir—whether such as to permit the drainage of a large area by each well—and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. A plain and substantial disregard of this requirement constitutes a breach of the covenant for the exercise of reasonable diligence, which, as before shown, is also made a condition of the lease under consideration."

It will appear from this discussion, and from a reading of the other cases following this line of decision, that the application of this doctrine depends largely upon the facts in each particular case. Under the assignments of error, this question is presented to the court in the case at bar: Did the facts in the case warrant the court in applying this rule of decision to this particular case?

It has often been said that equity abhors a forfeiture, and that courts of equity will not lend their aid to declare a forfeiture. The better rule seems to be in such cases that equity jurisdiction cannot be successfully invoked, unless the forfeiture will

effectuate justice; that, where the forfeiture would work a hardship or an injustice, aid in equity will be denied.

Mr. Justice Van Devanter says in regard to this rule in the Brewster case, *supra*:

"The better view is that the rule is not absolute or inflexible, any more than is every forfeiture harsh and oppressive; that its influence and operation do not extend beyond the reasons which underlie it; and that, in cases otherwise properly cognizable in equity, there is no insuperable objection to the enforcement of a forfeiture when that is more consonant with the principles of right, justice, and morality than to withhold equitable relief. As stated by Story, Eq. Juris. sec. 439: 'The beautiful character or pervading excellence, if one may so say, of equity jurisprudence is that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes.' In *Brown v. Vandergrift*, 80 Pa. 142, a case involving the forfeiture of an oil lease, it was held by the Supreme Court of Pennsylvania: 'In a case like this equity follows the law, and will enforce the covenant of forfeiture, as essential to do justice. It is true as a general statement that equity abhors a forfeiture; but this is when it works a loss that is contrary to equity, not when it works equity and protects the landowner against the indifference and laches of the lessee, and prevents a great mischief.' Other decisions to the same effect are *Munroe v. Armstrong*, 96 Pa. 307, 310; *Mehaffey's Appeal*, 4 Penny. (Pa.) 502; *J. M. Guffey Petroleum Co. v. Oliver* (Tex. Civ. App.) 79 S. W. 884, 888; *Vicksburg & Meridian R. Co. v. Ragsdale*, 54 Miss. 200; *Kellar v. Craig*, 61 C. C. A. 366, 126 Fed. 630; *Kansas City Elevator Co. v. Union Pacific Ry. Co.* (C. C.) 17 Fed. 200, 204; *Gadbury v. Ohio & Indiana Consolidated, etc., Co.* [162 Ind. 9], 67 N. E. 259, 261, 62 L. R. A. 895. The last case involved the forfeiture of a gas lease, and it was held by the Supreme Court of Indiana: 'Forfeitures are usually against conscience, and without equity, and it is for these reasons that courts of chancery ordinarily refuse relief in such cases; but an exception to the rule must exist where it be against equity to permit the defendant to longer assert his title. * * * The lack of any other remedy, and the danger that the gas might be withdrawn through wells on other lands, makes a case of this kind appeal to the conscience of the chancellor, and calls upon him to enforce the incurred forfeiture by removing the cloud from the title.' "

We cannot say upon the record before us that the enforcement of the forfeiture in the instant case would effectuate justice, but are rather constrained to hold that it would work iniquity. The testimony does not support the findings of the court below, nor is the judgment justified under the law. There was certainly no negligence in drilling on this lease, since one well was drilled in 1906 and five in 1907. While there may have been some recklessness in the way in which these wells were drilled, and the failure to exercise good judgment in bringing in wells 1 and 2, and in shooting the well at location 12, still the acts of the lessee must be judged in the light of the surroundings existing at the time (1907) when the Morris field was untried and unproven territory, and not in the light of the experience at the time of the trial in 1911, after the field had become proven territory and a developed oil field. Then, again, there are other facts in the plaintiff's case that do not appeal to the conscience of the chancellor. The court below found that the principal cause of forfeiture was the manner in which these wells were drilled in during the year 1907. The plaintiff was there at the time the wells were drilled in and knew then as well as he knew three years later, when suit was filed, that he had a cause of action for rescinding his contract, if he had one at all on this account; but he stood by and was present on every pay day and received his royalties, and received them promptly, while the lease was under the operation of the trustee named in the trust deed in 1908 and 1909, and also after the lease passed to the National Supply Company of Kansas, at the foreclosure sale in September, 1909, and during its operation of the lease from that date up to May 13, 1910, this plaintiff was present and at all times ready and willing and did accept, without protest, the royalties provided for under the lease from these several operators. Then, again, in a few days after commencing this suit to cancel the lease he entered into a contract with the Kansas company whereby it was agreed that, if the suit was successful, he would execute to the Kansas company, or some person it might designate, another oil and gas lease on a part of the premises, whereby his royalties would be increased. In view of these facts and

others appearing in this record, we cannot hold that this plaintiff came into court with "clean hands," as he must do in order to invoke the jurisdiction of a court of equity in his behalf.

Our statute (section 986, Rev. Laws 1910) requires one seeking to rescind a contract at law to act with diligence. In equity the diligent, and not the slothful, suitor is rewarded.

The plaintiff testified at the trial that he had made up his mind to bring the suit about a year and a half before it was brought. While the expiration of this length of time after the discovery of his right and the formation of an intention to rescind and commencing the suit is possibly not sufficient to bar the action, yet this, taken in connection with the further fact that he did not commence the suit until after Bass had absconded, and Brady, Bass' manager, had died, until after the two persons best acquainted with drilling the wells and operating the lease were beyond the jurisdiction of the court, is a very strong additional circumstance of the want of "clean hands" in the plaintiff in invoking the aid of a court of equity. To permit a forfeiture of the lease upon this record upon the ground sought would not only work a great hardship upon the lessee, but would give the lessor the fruits of the lessee's labor and property most unjustly, and would permit the lessor to "reap where he sowed not." At the time of the execution of the lease in controversy, March, 1906, it does not appear that the plaintiff's land had any particular value, except for agricultural purposes. It was simply a farm. While a consideration of $5 per acre is recited in the lease, the plaintiff testified that only $1 was paid, and it appears that this recital was placed in the lease to give to it a fictitious commercial value. At the time of the trial of this cause, some five years later, the plaintiff's property was worth, it appears, any sum between $15,000 and $30,000, and he had collected the sum of $8,000 or $10,000 in royalties. This large sum in royalties and the increased value added to the plaintiff's farm was by reason of the lessee's efforts, and at his expense, and without the expenditure of a dollar of plaintiff's own money. The record seems to support the contention of the plaintiff in error that this in-

creased value added to the land cost the lessee and the sublessee from $30,000 to $40,000.

Can a court of conscience say that, on account of the bad judgment or even negligent and reckless management of the lease by the subtenant, it would effectuate justice to cancel the lease and kick the lessee out in this summary manner, without notice or warning, and turn over to the lessor the fruits of this great labor and expense? It does not seem so.

Then the judgment for $8,000 damages cannot be justified by the testimony. The rules by which these damages were estimated were so indefinite and uncertain as to amount at most to a mere guess. The production from the wells on the lease in controversy, as well as that from the wells on the adjoining land, was unequal and variant. Well No. 1 came in with an initial flow of 1,200 barrels, No. 2 with 800 barrels, and No. 3 with 175 barrels, and No. 4 with little or nothing. The wells were all drilled into the same sand, and were located on the same 40 acres, and only a few hundred feet apart, and yet their production was so variant that it seems little less than absurd for a court to solemnly adjudicate that, for careless and negligent drilling and operating these wells, the landowner had been damaged $4,000 in loss of royalties and an additional $4,000 in damages to the land itself.

For these reasons, we conclude that the judgment appealed from should be vacated and set aside, and said cause remanded to the district court of Okmulgee county for further proceedings not inconsistent with the views herein expressed.

By the Court: It is so ordered.