## EMPIRE GAS & FUEL CO. v. HAGGARD.

No. 20023. Opinion Filed July 14, 1931.

Rehearing Denied Oct. 13, 1931.

Harrell & Kerr and Warren T. Spies, for plaintiff in error.

King & Delaney, for defendant in error.

HEFNER, J. On April 14, 1921, B. F. Haggard and Sarah Haggard, his wife, executed an oil and gas lease on certain land in Pontotoc county to George Nance, Jr. Thereafter Sarah Haggard procured a divorce from B. F. Haggard, and in the decree was awarded a royalty interest in and to the land. Subsequent to the execution of the lease Sam Beeker and Harry Hagar acquired an interest in the lease, and in connection with Nance drilled an oil well thereon. The oil well was completed at a depth of 2,200 feet in October, 1921. On March 20, 1922, the lease was sold and assigned to the Empire Gas & Fuel Company, which kept operating the oil well located thereon until sometime in 1926. Sarah Haggard then brought suit against the Empire Gas & Fuel Company to cancel the lease because of an alleged failure to develop. The Empire Gas & Fuel Company, defendant, filed a disclaimer in the action, and the suit was dismissed without prejudice.

Sarah Haggard, as plaintiff, thereafter brought suit in the district court of Pontotoc county against the defendant to recover damages because of alleged negligence on the part of the company in the operation of the well. The trial was to a jury and resulted in a verdict in favor of plaintiff in the sum of $2,500.

Defendant contends that the evidence was insufficient to support the verdict, and that the court erred in overruling its motion for a directed verdict. The evidence discloses that a producing well was drilled on the lease in October, 1921, at a depth of 2,200 feet by Nance and associates; that the initial production was from 85 to 100 barrels per day. The production gradually declined, and in March, 1922, the date defendant acquired the lease, the well was producing 20 barrels per day, and on April 14, 1926, the date defendant abandoned the well, it was producing only 1½ barrels per day. The evidence further establishes that, in drilling the well, a sand said to be a producing sand was encountered at a depth of 1,600 feet, but that no attempt was made to produce oil therefrom.

The evidence also establishes that, at the completion of the well, Nance and his associates shot it with 200 quarts of nitroglycerin, and thereafter failed to clean out the bottom of the well; that defendant was advised of this fact, and advised of the 1,600-foot sand at the time it purchased the lease.

The evidence also discloses that after defendant abandoned the well, Hagar and others associated with him procured a new lease on the land from plaintiff and her former husband, and paid therefor the sum of $30, and that they attempted to make the well a paying producer; that they cleaned out the bottom of the well, drilled it 12 feet deeper, and again shot it with nitroglycerin; they also attempted to produce from the 1,600-foot sand and in doing so lost the well. Hagar, after testifying to the above state of facts, further testified as follows:

"Q. In your opinion, as a practical oil man, what would that well have made after that, on the pump? After you had cleaned out to bottom? A. About 20 barrels. * * * Q. What, in your opinion, after cleaning out after the shot, would the well made in the Hunton Lime? * * * A. We never had a correct gauge on the well, but I don't think there is any question of the well making 25 barrels. * * * Q. Now, Mr. Hagar, in your opinion, as an oil man, after ripping the pipe at the 1,600-foot sand, that production, together with the production from the Hunton Lime, what would the well have made? * * * A. 40 or 50 barrels."

On cross-examination this witness testified that, after cleaning out the bottom of the well, it made from 12 to 14 barrels a day; that a well with less production than 25 barrels per day could not be considered a commercial or paying well; that the well could not have been made a paying well without ripping the casing at the 1,600-foot sand and producing therefrom; that he did rip the casing at that sand in an attempt to produce therefrom; that the casing collapsed, resulting in the loss of the well, and that he and his associates spent considerable money in attempting to produce from that sand and were unable to do so.

Plaintiff also offered evidence that Hagar made a proposition to defendant to clean the bottom of the well and to produce from the 1,600-foot sand free of cost to defendant in the event he failed to make the well produce 40 barrels per day, and that defendant refused the offer. This is, in substance, the evidence relied upon by plaintiff.

It is conceded by plaintiff that before she is entitled to recover, she must establish that the defendant could have made a reasonable profit by further developing and operating the well. There is no evidence that such profit would have been made except

the mere guess of Haggard and his associates that the well could have been made a paying one by cleaning out the bottom and producing from the 1,600-foot sand. There is no substantial proof that this sand was or could have been made a paying sand. There are no other producing wells in the field from this sand, nor is there any other producing well in the field except one about one mile distant. Plaintiff contends that it was the duty of defendant to clean out the bottom of the well and to produce from both sands. Defendant offered evidence to the effect that it was impracticable to attempt to produce from the 1,600-foot sand, that such undertaking would have been too hazardous, and that it would likely have resulted in a collapse of the casing and a complete loss of the well. The evidence discloses that defendants were justified in refusing to take this risk as the evidence offered by plaintiff establishes that the attempt on the part of Hagar to produce from this sand resulted in a collapse of the casing and a loss of the well.

Defendant was not required to expend its money on such hazardous undertaking. Especially is this true because there was no way of determining the probable production from this sand in the event the attempt to produce therefrom had been successful. Hagar and his associates testified that they spent all the money they could raise in attempting to produce therefrom, and failed. The evidence shows them to be experienced oil men. Plaintiff therefore appears in the position of attempting to recover damages against defendant because of its failure to do that which the evidence offered in her behalf discloses would have been futile and useless. It is true, as contended by plaintiff, that she had some rights as a royalty owner, and defendant could not willfully abandon a paying well to her injury, but the burden was on her to show that the defendant could have continued operating the well with a reasonable profit to it.

Speaking on the question of the duty of the lessee to continue operations, the Circuit Court of Appeals in the case of Brewster v. Lanyon Zinc Company, 140 Fed. 801, said:

"No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them."

See, also: Goodwin v. Standard Oil Co., 290 Fed. 92 (1923); Indiana Oil Co. v. McCrory, 42 Okla. 136, 140 Pac. 610; United Central Oil Corp. v. Helm, 11 Fed. (2d) 760. There is no evidence that the defendant could have made a profit by continuing oper-

ations. A motion for a directed verdict should have been sustained.

Judgment is reversed and the cause remanded, with directions to enter judgment in favor of defendant.

There is no evidence that the defendant could have made a profit by continuing operations.

LESTER, C. J., CLARK, V. C. J., and RILEY, CULLISON, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. SWINDALL, J., absent.