## PELHAM PETROLEUM CO. v. NORTH.

No. 10437—Opinion Filed March 9, 1920.

Rehearing Denied April 6, 1920.

(Syllabus by the Court.)

**1. Appeal and Error — Review — Equity Cases.**

In an equitable action this court will weigh the evidence, and if the judgment of the trial court is clearly against the weight thereof, will render, or cause to be rendered, such judgment as said court should have rendered.

**2. Oil and Gas—Failure to Develop Lease—Forfeiture—Evidence.**

Although a court of equity will decree a forfeiture of an oil and gas lease on account of a breach of an implied covenant to diligently operate and develop the property, when such forfeiture will effectuate justice, the granting of such relief depends upon the facts and circumstances surrounding the particular case.

**3. Same—Decree—Conformity to Circumstances.**

A court of equity has the power to conform its decrees to the varying circumstances of each particular case, and if the evidence shows that a part of the leased premises under an oil and gas lease have been properly developed with reasonable diligence by the lessee, and other parts have not, the court may cancel the lease as to the undeveloped portion and permit the lessee to continue to operate the developed part thereof.

**4. Oil and Gas—Lease—Duty to Develop—Construction.**

Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which, or the diligence with which, the operations shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both.

**5. Same—"Protecting Side Lines."**

A stipulation in an oil and gas lease whereby the lessee obligates itself "to protect the side lines in case oil is found in paying quantities" imposes upon the lessee the same obligation to protect the lessor's land from actual or threatened drainage that the courts universally hold to be upon it in the absence of express stipulation to that effect.

**6. Same—Drilling Offset Wells.**

The provision means that the lessee is required to drill an offset well in case oil is found on adjacent lands near the boundary line of lessor's land in sufficient quantities to pay a reasonable profit on the whole sum required to be expended, including the cost of drilling, equipping, and operating the well.

Error from District Court, Tulsa County; Conn Linn, Judge.

Action for forfeiture of oil and gas lease by W. L. North against the Pelham Petroleum Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Rice & Lyons, for plaintiff in error.

Luther James and R. F. Morley, for defendant in error.

RAINEY, J. This action was instituted in the district court of Tulsa county by W. L. North, plaintiff, against the Pelham Petroleum company, a corporation, defendant, to declare a forfeiture of a certain oil and gas lease executed by the former in the year 1907 to the Arena Oil Company, and which, by intermediate assignments, had been transferred to the defendant several years prior to the institution of the action. The lease covered the northwest quarter of the northwest quarter and the south half of the northwest quarter of section 33, township 19 north, range 13 east, and its provisions, in general, were similar to those usually found in leases of this character, but the drilling clause was somewhat different. It reads:

"To commence a well on said premises within thirty days from the date hereof * * * One well to be completed each year until three wells have been completed, or pay one dollar per acre a year rental on each forty not drilled upon, and to protect all side lines in case oil is found in paying quantities."

Plaintiff seeks to forfeit all of the leased premises except that part thereof necessary to operate the wells already drilled, on the ground that the defendant by failing to drill any additional wells for four successive years abandoned all other parts of the lease and breached the covenants to develop the premises, and on the further ground that defendant company has breached the express covenant in the lease to drill offset wells.

After issue was joined, the cause was tried to the court, resulting in a finding that the defendant had not developed the northwest quarter of the northwest quarter of said section in the manner contemplated by the lease and the rules governing the development and operation of oil and gas leases in this state, and that said defendant had not protected the west line of said forty-acre tract by drilling offset wells as contemplated. The court also found that the defendant had not developed the southeast quarter of the northwest quarter of said section, as required by the lease and law governing the development of oil and gas mining leases, and had, therefore, abandoned and forfeited the same. Judgment

was entered accordingly, to reverse which this proceeding in error was commenced.

This being a case of equitable cognizance, it is our duty to weigh the evidence, and if after weighing the same we find the judgment of the trial court to be clearly against the weight thereof, to render, or cause to be rendered, such judgment as the trial court should have rendered. Schock v. Fish, 45 Okla. 12, 144 Pac. 584; Crump v. Lanham, 67 Oklahoma, 168 Pac. 43.

But before entering upon a consideration of the evidence it is proper here, we think, to dispose of plaintiff's contention that he is entitled to a cancellation of the lease on the southeast quarter of the northwest quarter and the northwest quarter of the northwest quarter of section 33, on account of nonpayment of rentals for the years 1914, 1915, 1916 and 1917, alleged to be due him by the defendant company under the drilling clause of the lease. Under the undisputed evidence it conclusively appears that this provision of the lease has not been breached. Under this clause the lessee had the option either to complete a well each year until three wells had been completed or to pay one dollar per acre a year rental on each forty-acre tract not drilled upon. Although the evidence shows that one well was not completed each year until three wells were completed, it does show that rentals were paid upon the southwest forty not drilled upon until it was developed, and further shows that the two forty-acre tracts sought to be cancelled had been drilled upon prior to 1914, although the drilling operations on the southeast forty resulted in a dry hole. Moreover, the payment, of rentals was not an issue raised by the pleadings, and the court did not make any finding thereon.

Preliminary to a consideration of the evidence we will advert to the law applicable to cases of this character, where it is sought to forfeit an oil and gas lease for failure of the lessee to exercise reasonable diligence in prosecuting the work of production and development after oil and gas have first been found within the time granted by the lease for prospecting the premises. It is now well settled that a court of equity will declare a forfeiture of an oil and gas lease because of the breach of an implied covenant to diligently operate and develop the property when such forfeiture will effectuate justice, but the granting of such relief depends upon the facts and circumstances surrounding the particular case. Indian Oil, Gas & Development Co. v. McCrory, 42 Okla. 136, 140 Pac. 610; Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213.

The material evidence in this case may be stated as follows: The 120-acre tract of land covered by the lease, which comprises three 40-acre subdivisions, is situated in what is commonly denominated by oil men as "spotted field," which is evidenced by the fact that it is not uncommon to get a dry hole a location away from a producing well. The production where found is light, and the quantity of oil decreases rapidly from the initial production. In order to have a clearer and more vivid conception of the development upon the lease in controversy than can be had from narration only, we here insert a plat showing the development upon plaintiff's lands and other lands contiguous thereto. O represents a producing well, x a dry hole, and * an abandoned well.

The wells on plaintiff's lease are numbered from 1 to 9, in the order in which they were drilled. It will be noted that two dry holes have been drilled on the southeast forty; one in 1907, and the other in 1913; five producing wells on the southwest forty, all of which were completed in 1912 and 1913; and that a well and a dry hole were drilled in the northwest forty. The wells in the southwest forty had an average initial production of about fifteen barrels per day, but this production rapidly decreased until some of them were making only from one to two

barrels per day within a month. One of the wells came in at ninety barrels per day and decreased to fifteen barrels per day within a month. At the time of the trial the total production from the five wells was about seven barrels per day. The well on the northwest quarter marked 1-A was drilled in the winter of 1907-08. According to Mr. North's testimony the initial production of this well was about twelve barrels per day, but this production rapidly diminished, and before the lease was assigned to the defendant company the well had been abandoned. On Mr. North's insistence that it was a good well, and to satisfy him, the defendant company, in 1913, drilled another well within a few feet of this abandoned well, the same being No. 7 on the plat. The last well had an initial production of twelve barrels per day, but within a month it was only making about one and one-half barrels per day, and at the time of the trial was making from one-fourth to one-half barrels per day. It will also be noted that there is a dry hole in the southwest corner of the forty-acre tract immediately north of the northwest forty in controversy, the same being about 200 feet from the north line of said forty. It was drilled in 1908. The dry hole on the forty-acre tract immediately east of the northwest quarter in controversy was drilled in the fall of 1916, but

there is a small producing well on the forty immediately north of this one. The defendant company has a lease on the forty-acre tract of land immediately south of the southeast forty in controversy, on which it has three producing wells, marked on the plat A, B and C. The well marked A was drilled in December, 1915; B, January, 1917, and C, either in February or March, 1917. Wells B and C had an initial production the first day of forty and thirty-five barrels, respectively, and the three wells, A, B and C are now making a total of about twelve barrels. There are two producing wells on the forty-acre tract in section 32, immediately west of the northwest forty in controversy. The well on the east line is about 150 or 200 feet from plaintiff's land, and was drilled in May, 1917. It had an initial production of between five and six barrels, and at the time of the trial, just a few months after it was drilled, it was making sixty-five barrels per month, or slightly in excess of two barrels per day. The well in the center of this forty-acre tract, which is about 650 feet from the west line of plaintiff's northwest forty, is making about twenty-five barrels. It was completed shortly before the trial of this case. The producing sands on the lease in controversy are from about seven to fourteen feet. At the time the wells were drilled they cost about $1,500 each. The price of oil in 1910, 1911 and 1912 ranged from about forty cents to seventy-five cents per barrel; in 1913 and the early part of 1914, from eighty-six cents to $1.05; in 1915 it went down to about forty-one cents, and gradually increased to $1.25 in 1916. It then went down again in November, 1916, the price being one dollar. Then the price again increased until in 1917, at the time of the trial, it was two dollars.

The defendant company's witnesses testified that the cost of drilling and equipping the wells on the lease in controversy had exceeded what the company had received from the oil produced, and that the lease had not paid out. This testimony was not disputed.

With this general summary of the evidence in mind, we will proceed to inquire into the equities of the case. The action was brought and the judgment rendered on the theory that, where the evidence discloses that a part of the leased premises has been properly developed with reasonable diligence by the lessee and other parts have not, a court of equity will cancel the lease as to the undeveloped part, but may permit the lessee to continue to operate the developed part thereof. This view finds support in the cases of Coffinberry v. Sun Oil Co. (Ohio) 67 N. E. 1069, and Jennings v. Southern Carbon Co. (W. Va.) 80 S. E. 368, and we know of no reason why a court of equity should not conform its decrees to the varying circumstances of each particular case in order to effectuate justice between the parties.

As we have already observed, it is plaintiff's contention that he is entitled to have defendant's lease on the southeast forty acres in controversy cancelled for alleged failure of the defendant company to develop that part of the lease with reasonable diligence, and to protect the lines by offset wells, and he makes a similar contention as to all the northwest forty, except the southeast ten acres of said tract. The evidence conclusively shows, to our mind, that the defendant has not breached its duty to protect the southeast forty from drainage. It does not appear that prior to 1917 there were any offset producing wells on lands of other parties adjoining this forty-acre subdivision of the leased premises. Although it is asserted by plaintiff that wells B and C on the forty immediately south of this tract were near enough to be offset wells, there is not any evidence in the record to the effect that they are near enough to be considered offset wells, or that they, either in fact or in probability, are draining the oil from plaintiff's land. It appears, moreover, that these wells were drilled only a short time before the trial of this action, and that soon after they were completed the defendant company made a location preparatory to making further exploration on the southeast forty, but was prevented from so doing by the action of the plaintiff in procuring an injunction against it.

As was well said in the case of Brewster v. Lanyon Zinc Co., supra, the object of the operations is to obtain a benefit or profit for both lessor and lessee, and in the absence of some stipulation to that effect, neither is made the arbiter of the extent to which, or the diligence with which, the operations shall proceed, and both are governed by the standard of what is reasonable, and there may, therefore, be a breach of the covenant for the exercise of reasonable diligence, although the lessee is not guilty of fraud or bad faith. In this connection we wish to say that we are in complete accord with the views of that learned court relative to the degree of diligence incumbent upon the lessee so happily expressed in the following language:

"But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and devel-

opment, and the fact that the lessee must bear the loss if the operations are not successful, requires that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefor or the means of transporting them to market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir—whether such as to permit the drainage of a large area by each well—and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. A plain and substantial disregard of this requirement, constitutes a breach of the covenant for the exercise of reasonable diligence, which, as before shown, is also made a condition of the lease under consideration."

Now, in the instant case, several operators of experience testified that the defendant company had diligently and properly developed the leased premises. It is true that this is expert evidence, but it is in harmony with all the other evidence in the record, and it seems to us the only logical deduction that can reasonably be drawn therefrom, and we are satisfied, after a consideration of the facts above related, together with all the other evidence in the record, that the lessee has done all that could reasonably be expected of it, unless it should have drilled an offset well on the northwest forty in controversy, to which inquiry we now pass.

The only reasonable construction that can be given the language of the drilling clause of the lease which obligates the lessee "to protect all side lines in case oil is found in paying quantities" is that the lessee thereby became obligated to protect plaintiff's land from drainage or threatened drainage by the drilling of offset wells on the lessor's premises in the event oil was found in paying quantities on adjacent lands. Obviously this was the intention of the contracting parties and it imposed upon the lessee the same obligations which the courts universally hold to be upon it in the absence of an express stipulation to that effect. As was said in Eastern Oil Co. v. Beatty, 71 Oklahoma, 177 Pac. 104, the obligation thus imposed was not against permitting any drainage, however slight, but was against actual or threatened drainage in

a substantial sense. The pertinent inquiry, then, is whether oil was found in paying quantites in the well drilled on the forty-acre tract immediately west of and adjacent to the northwest forty in controversy and within 200 feet of plaintiff's lands, the same being the one it is claimed the defendant should have offset. In order to correctly weigh and apply the evidence in the case it is essential to have a clear and definite idea of what is meant by "oil in paying quantities" in the connection in which the term was used. It has been held, and we think correctly, that the term "paying quantities," as employed in an oil lease granting the premises for a given term and as much longer thereafter as oil is produced in paying quantities, means in paying quantities to the lessee, and in such cases it is said that oil is found in paying quantities if the well pays the lessee a profit, however small, over operating expenses, although it may never repay the cost of drilling and the operations as a whole may result in a loss. Words and Phrases, vol. 6, p. 5247; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433; Young v. Forest Oil Co., 194 Pa. 243, 45 Atl. 121; Aycock v. Paraffine Oil Co. et al. (Tex.) 210 S. W. 851.

In the case of Manhattan Oil Co. v. Carrell (Ind.) 73 N. E. 1084, there was presented to the supreme court of Indiana the meaning of the term "oil in paying quantities" in an oil lease providing that after the completion of the first well the lessee should drill a specified number of wells in case oil should be found in paying quantities, and that court, in a very able opinion, held that the term meant, in the connection in which it was used, that additional wells should be drilled only in case oil was found in such quantities as would, taken in connection with other conditions, induce ordinarily prudent persons in a like business to expect a reasonable profit on the whole sum required to be expended. In that case the trial court had instructed the jury, in effect, that if, after a well had been drilled, it paid even a small profit over the expense of operating it, it produced oil in paying quantities, although it might never repay its costs, and the operations as a whole might result in a loss. With reference to this instruction, the court said:

"To confine the meaning of the phrase 'if oil is found in paying quantities' to the limits outlined by the instructions seems preposterous. It amounts to telling the jury that, excluding the cost of sinking and equipping a well, if it be found that it pays to pump the well—that is, if the oil obtained yields a profit, however small, over the expense of pumping, and incidental repairs to the pumping machinery—then the jury must find that oil is found in paying quantities, within the

meaning of the contract. We cannot accept this rendering as correct. If the capital expended in the making and equipment of wells is not to be counted, and the undertaking, as a whole, results in a loss, how can it be said to be paying? It seems very plain to us that the additional wells were to be drilled only in the event that oil was found in such quantity as would, taken in connection with other present conditions, induce ordinarily prudent persons engaged in like business to expect a reasonable profit on the full sum required to be expended in the prosecution of the enterprise."

While the question of drilling additional wells on the lessor's premises after the completion of the first well is not exactly the same as the question of drilling offset wells where oil has been found in paying quantities on adjacent premises near enough to require offsetting, we cannot perceive any substantial difference in the principle involved. In the case of Aycock v. Paraffine Oil Co. et al., supra, the Court of Civil Appeals of Texas gave the term "oil in paying quantities" a like definition as applied to an offset well. The lease under consideration in that case provided that the lessee should "develop said land for oil and other minerals whenever it is necessary to protect said land from being drained by wells on adjacent lands, and within a reasonable time; that is to say, when a well or wells shall have been completed and are producing oil in paying quantities within 200 feet of the boundary lines of the land covered by this lease." In an action for failure to drill an offset well under said provision the trial court instructed the jury that the term "oil in paying quantities" meant that the oil produced could be marketed in such manner as to offset the expense of drilling the wells producing it, and the additional expense of operating said well or wells producing the same, and the correctness of the instruction was sustained by the Court of Civil Appeals. In Eastern Oil Co. v. Beatty, supra, an adherence to the same doctrine is plainly indicated by this court. We think the language of the drilling clause in the instant case shows the lessor and lessee contemplated that in case oil was found on adjacent lands near the boundary line of the lessor's land the lessee should drill offset wells if the oil so found was in sufficient quantities to pay a reasonable profit on the whole sum required to be expended, including the cost of drilling, equipping and operating the well.

Counsel for plaintiff evidently tried the case on the theory that it was obligatory upon the defendant to drill the offset well if the well on the adjacent premises sought to be offset produced oil in sufficient quantities to pay to operate it, excluding the cost of drilling and equipment. This is evi-

denced by the following questions propounded to Mr. Schlegel, and the answers returned by him:

"Q. I will ask you if it pays under the present conditions to operate a well that makes that amount of oil? A. At that depth, yes, sir. Q. And has it paid all the time ever since it came in, to do it? A. Yes, sir."

The boundary line well, which it is contended the defendant should have offset, was drilled to a depth of about 1,800 feet, but no oil sand was found below 990 feet. The well at first produced from that depth about five or six barrels per day, but, as above stated, the production soon diminished and the well was producing only slightly more than two barrels per day at the time of the trial, only a few months after it was drilled. The evidence in the record, however, is not sufficient for us to determine whether or not this well produced oil in sufficient quantities to pay the lessee a reasonable profit on the whole sum required to be expended in drilling, equipping and operating the well; and since the burden was on the plaintiff to prove that it did produce oil in paying quantities, our conclusion on this issue also is that the judgment is not supported by the evidence. Inasmuch as neither the lessor nor the lessee is the arbiter of this question we think a new trial should be granted on this issue. If the evidence adduced at the retrial shows that it was a paying well as herein defined, the court should enter judgment canceling all of the northwest forty, except the southeast ten acres as prayed by plaintiff, but, for the reasons hereinbefore stated, the judgment canceling the lease on the southeast forty should be set aside. The cause is, therefore, reversed and remanded, with directions to the trial court to proceed in accordance with the views herein expressed.

OWEN, C. J., and PITCHFORD, JOHNSON, HIGGINS, and BAILEY, JJ., concur.