### GOODWIN v. STANDARD OIL CO. OF LOUISIANA et al.

(Circuit Court of Appeals, Eighth Circuit.  May 7, 1923.)

No. 6173.

1. **Mines and minerals ⬦78(1)—No breach of implied covenant to drill protection wells, except for want of reasonable prudence and care.**

Though a lessee, not guilty of fraud or bad faith, may be liable for failure to exercise reasonable diligence in drilling protection wells, and though the lease contains no express requirement, yet no breach of an implied covenant can occur except where the absence of such diligence on the part of the lessee is both certain and substantial, in view of the· actual circumstances at the time, as distinguished from mere expectations on the part of lessor and conjecture on the part of mining enthusi-

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes·

asts, the expense of exploration and development, and the fact that lessee must bear the loss of unsuccessful operations, entitle him to proceed with due regard for his own interests, as well as those of the lessor.

2. **Mines and minerals** ⊚═78(7)—**Evidence held insufficient to warrant finding of breach of implied covenant to drill protection wells.**

Evidence that lessees began the drilling of the leased property within two months after the completion of the first well drilled on land adjoining the lease, and that within two months thereafter the defendants commenced the drilling of other offset wells, and that when completed the wells produced gas, but no oil, *held*, with other evidence as to the production on adjoining land, and the expense of well drilling, and the entire lack of market for gas, not to show such absence of reasonable diligence on the part of lessee as to drilling protection wells as was both certain and substantial, such as would warrant cancellation of the lease.

3. **Mines and minerals** ⊚═78(7)—**Burden of proof on lessor to show want of lessee's diligence to drill protection wells.**

In an action for the cancellation of oil and gas lease and damages for breach of implied covenant to drill protection wells, the burden is on the plaintiff to prove the want of due diligence on the part of the lessees in drilling such offset wells.

Appeal from the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Suit in equity by G. H. Goodwin against the Standard Oil Company of Louisiana and others. Judgment for defendants, and plaintiff appeals. Affirmed.

W. S. Goodwin, of El Dorado, Ark., and William H. Arnold, Jr., of Texarkana, Ark. (W. J. Goodwin and J. S. Belt, both of El Dorado, Ark., and William H. Arnold and David C. Arnold, both of Texarkana, Ark., on the brief), for appellant.

James D. Head, of Texarkana, Ark. (T. M. Milling, of Shreveport, La., T. J. Gaughan and John T. Sifford, both of Camden, Ark., and Neil C. Marsh and Tom Marlin, both of El Dorado, Ark., on the brief), for appellees.

Before STONE, Circuit Judge, and BOOTH and JOHNSON, District Judges.

BOOTH, District Judge. This is a suit by appellant, plaintiff below, seeking to cancel an oil and gas lease for breach of covenant, to recover damages by reason of the breach, and to recover damages for certain acts of trespass on the leased lands. The lease was made April 21, 1919, by plaintiff to Arrendale & Hunt, and was later acquired by defendants. It covered the N. E. ¼ and the fractional N. E. ¼ of the S. E. ¼ of section 36, township 17, range 16, and was in the usual form of such leases. The consideration recited was $1 and "the covenants and agreements hereinafter contained on the part of the lessee to be kept and performed."

The lease ran for five years and "as long thereafter as oil or gas or either of them is produced from said land by the lessee." The lessee agreed to pay lessor one-eighth of the oil produced and one-eighth of the gas saved and sold off the premises. The lessee further agreed: (1) To drill a test well on the premises or within six miles of

the same, within one year, otherwise the lease should become null. (2) If the test well was not drilled on the lands covered by the lease, then to drill a well upon said lands before the end of the second year; otherwise, the lease should terminate, unless before that date the lessee should pay or deposit in bank, to lessor's credit, $27.75, which should operate as rental and cover the privilege of deferring the commencement of the well for 12 months after the expiration of the 2 years, and in like manner, and upon like payments, the commencement of a well might be further deferred for like periods.

The evidence shows, and it is conceded, that the defendants performed all of the express covenants of the lease. The test well was drilled the first year within six miles of the premises, and in addition $185 was paid to the plaintiff as rental for the first year, although no rental was provided for that period. No well was drilled upon the premises the second year, but in lieu thereof a rental, not of $27.75, but of $185, was deposited in the bank to the credit of plaintiff, before the expiration of said year.

During the early part of 1921, and before the end of the second year of the lease (April 21, 1921), several wells had been drilled by third parties on lands adjoining the leased premises, and about 200 feet from the boundary, resulting in the production of both gas and oil. It is the claim of plaintiff that, by reason of the drilling of these wells, by third parties, there arose an obligation on the part of defendants to drill offset or protection wells on the leased premises; that this obligation arose out of an implied covenant in the lease, and that a failure to drill such wells was a breach of this implied covenant, which would justify a cancellation of the lease; and that defendants are liable in damages for the loss of oil and gas, which plaintiff claims have been drained from the leased premises by the wells on the adjoining lands.

At the close of the trial the court dismissed the suit for want of equity, so far as it sought cancellation and damages for breach of the lease, and dismissed the bill without prejudice so far as it sought damages for trespass. Several questions arise on the record:

(1) Was there an implied covenant in the lease, requiring the defendants to drill protection wells?

(2) Was this covenant, if it existed, of such character that its breach would warrant a cancellation of the lease?

(3) If the implied covenant existed, did the evidence show a breach thereof?

(4) Was plaintiff entitled to damages?

We pass at once to the third question, and shall assume during its discussion that the first two questions should be answered in the affirmative.

[1] The tests for determining whether a breach of an implied covenant to drill oil or gas wells has been committed are set forth clearly in the case of Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213. In that case the court was considering an implied covenant to continue exploration and development after the expiration of the fixed period of development, during which oil or gas had been found

to exist in paying quantities; but we think the tests are also applicable to the present case, involving an alleged implied covenant to drill protection wells. In its opinion in the Brewster Case, this court said:

"The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. * * * There can, therefore, be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith. But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. * * * Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

Similar tests are suggested in Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S. W. 286, 19 A. L. R. 430, and Pelham Co. v. North, 78 Okl. 39, 188 Pac. 1069.

With these tests in mind, we turn to the evidence in the present case. At the time the lease was made, drilling on the lands covered was recognized as "wild-catting." It is so recited in the lease. In January, 1921, a well, known afterward as the "Busey discovery well," was brought in. This was located somewhat less than one-half mile south from the Goodwin lands. The extent of its production is not shown in the record, although there is testimony to the effect that it was a gusher. Drilling of the wells about which the present controversy centers, which were located about 200 feet north of the north line of the leased land, commenced about February 12, 1921. This suit was commenced April 29, 1921. Since plaintiff can hardly complain of inaction on the part of the defendants after the suit was brought, it follows that the period during which the conduct of defendants is to be tested is that from February 12 to April 29, 1921. The wells brought in during that period, in proximity to plaintiff's land, are as follows:*

Federal No. 1.—Started February 12, 1921; completed March 24, 1921. Came in with about 18,000,000 cubic feet of gas, and gradually produced oil. Just how much it was producing during the first month after completion is not clearly shown by the record, but it may be inferred to have been approximately 200 barrels per day.

Magnolia No. 1.—Started February 18, 1921; completed April 2, 1921. Came in with 15,000,000 cubic feet of gas and about 500 barrels of oil per day. This well produced for 16 days. At that time the production changed to oil and water. The well was then closed, and arrangement made for separating the oil from the water. The well was reopened and produced oil for 2 or 3 days, when the water again appeared, and the well was closed a second time and another separator introduced. The well was opened for the third time, and

was found to be dead, and so remained until after the period above mentioned.

Magnolia No. 2.—Started February 21, 1921; completed April 10, 1921. Came in with 15,000,000 cubic feet of gas and about 119 barrels of oil. This continued flowing until after the period.

Federal No. 2.—Started April 1, 1921; completed April 21, 1921. Came in with 10,000,000 cubic feet of gas and a spray of oil. It continued to produce a small quantity of oil during the period.

Sorrel Trans-Continental No. 1.—Started March 9, 1921; completed April 17, 1921. Came in with 10,000,000 to 15,000,000 cubic feet of dry gas. The well was shortly afterward mudded in and drilled deeper. It then produced about the same amount of gas, and a spray of oil, but there was no real oil production.

It will thus be seen that the history of the five wells during the period in question was not uniform. Three of them were producing oil—two in considerable quantities, one in a very small quantity. A fourth at first produced oil, but water soon appeared; efforts were being made to successfully operate and separate the oil from the water. A fifth had produced gas only.

Gas was a drug on the market. There was no pipe line leading from the field to a place of any considerable consumption. Much more gas was being produced than could be used locally in the field of operation, and much of it was going to waste. The cost of drilling a well was from $22,500 to $25,000, and $4,000 or $5,000 additional were necessary if a pump was needed. The price of oil was from 30 cents to 70 cents a barrel, depending on its gravity. The evidence showed that there was considerable delay during the period mentioned in getting drilling outfits into this field, owing to a congestion of freight on the railroads.

On April 10, 1921, the defendants deposited in bank to plaintiff's credit, the rental of $185 for the year commencing April 21, 1921. No demand had been made by plaintiff on the defendants that they drill protection wells. On April 29, 1921, the present suit for cancellation was commenced. On the trial, plaintiff undertook to prove a custom in the oil and gas industry to drill protection wells as soon as wells were drilled near the boundary line on adjoining land; but the evidence fell far short of proving such a custom. It established rather the fact that the time of drilling protection wells in territory such as here disclosed, was almost entirely a matter of judgment.

Although the period, during which it is claimed defendants failed to observe the implied covenant in the lease, extended, as above stated, from February 12 to April 29, 1921, and is consequently the period primarily under consideration, yet as bearing upon the question of defendants' judgment or lack of judgment, during that period and as bearing upon the question whether they acted with reasonable diligence and prudence, we may properly look at subsequent events as disclosed by the evidence taken at the trial. Between the date of the commencement of the suit, April 29, 1921, and the time of trial, April or May, 1922, defendants, notwithstanding the suit, had drilled four wells on plaintiff's land, as follows:

Standard No. 1.—Started May 21, 1921; completed June 27, 1921. Came in with 15,000,000 feet of gas, but no oil.

Standard No. 2.—Started July 6, 1921; completed August 5, 1921. Came in with 5,000,000 feet of gas, but no oil.

Constantin No. 1.—Started July 10, 1921; completed in August, 1921. Came in with 7,000,000 feet of gas, but no oil. None of them had produced oil at the time of the trial.

These three wells were near the north boundary of plaintiff's land, and were offsets, respectively to Federal No. 1, Federal No. 2, and Magnolia No. 1. Another well, Standard No. 3, started December 8, 1921, completed February 5, 1922, came in with 25 barrels of oil. This was in the southeast corner of plaintiff's land. Still another well, Constantin No. 2, was located near the north boundary of plaintiff's land, but was not finally drilled, owing to the absence of oil in the wells already drilled on plaintiff's land near the north boundary.

The production of the five wells drilled on lands adjoining plaintiff's premises up to the time of trial was as follows: Federal No. 1, 109,000 barrels, and still producing. Federal No. 2, 2,000 barrels, not producing. Magnolia Nos. 1 and 2, 50,000 barrels, still producing. Sorrel Transcontinental No. 1, no oil. In all of these wells, which were producing, the production was greatly decreasing.

The evidence showed that if these five wells and the three wells which were drilled on plaintiff's land near the north boundary were considered together as one venture, it was not a paying investment. The conclusion reached by a number of witnesses, men experienced in drilling for oil, was that the history of the wells drilled on plaintiff's land along the north boundary showed that there was no oil there.

On the other hand, a number of witnesses of similar experience expressed the opinion that there was oil under plaintiff's land, but that the wells north of the boundary had commenced to drain it, and in so doing had caused underground lanes or channels to be formed in the oil-bearing sands, and that after these channels were formed the oil would continue to flow toward the older wells, even after the new wells were drilled on plaintiff's land, unless the gas pressure in the new wells was very great—great enough to break down the channels running toward the older wells.

It was conceded by witnesses for both parties that the wells on the adjoining premises would have drained some of the oil from plaintiff's land, if there had been any there; but there was a sharp conflict between the witnesses for plaintiff and defendants as to the formation of the so-called channels and the effect thereof if formed. It was conceded by the witnesses who upheld the channel theory that it had never to their knowledge been demonstrated to be true.

There was evidence which showed that in this same oil field it was not uncommon for a later well to kill or largely reduce the production of an older well in the immediate vicinity. One instance from this field was cited by witnesses, where a well came in with 20,000,000 feet of gas and 70 barrels of oil, and later a well less than 300 feet distant was brought in with 8,000,000 feet of gas and 350 barrels of oil. The evidence further showed that drainage would take place for at least

290 F.—7

660 feet in this field. · It is claimed that these occurrences disproved the theory of fixed channels. There was also evidence that in drilling the well, Standard No. 1, the drillers at one time lost their "returns," and that these "returns" did not appear in the offsetting wells on the lands adjacent, and it was claimed that the "returns" would have so appeared, if there were channels or lanes running to the offsetting wells.

[2, 3] In view of all the evidence, the question whether there was any draining of oil from plaintiff's land by wells on the adjoining lands was, in our judgment, purely speculative; and considering all of the evidence bearing upon defendants' diligence, and applying the tests· heretofore given, we cannot say that the "absence of diligence was both certain and substantial," nor can we say that the defendants failed to do "what would be reasonably expected of operators of ordinary prudence, having regard to the interest of both lessor and lessee." The burden of proof was upon the plaintiff (Pelham Co. v. North, supra), and we do not think it was sustained. Breach of the lease was not established.

· In view of the foregoing, it becomes unnecessary to determine whether the implied covenant existed, or whether, if it did exist, it was of such a character that its breach warranted cancellation of the lease. The court below rightly dismissed the bill, so far as it sought cancellation and damages for breach of the lease, and, in view of that situation, it committed no error in also dismissing, but without prejudice, the bill so far as it sought damages for alleged acts of trespass.

Judgment affirmed.