George SPILLER, Earl C. Adler, Bernard R. Adler, C. R. Keeton and Dena Keeton, Plaintiffs in Error,

v.

MASSEY & MOORE, a Mining Partnership, W. T. Massey, Harry A. Moore et al., Defendants in Error.

No. 40654.

Supreme Court of Oklahoma.

Sept. 21, 1965.

As Amended Oct. 14, 1965.

Swank & Swank, Stillwater, and Thurman S. Hurst, Pawnee, for plaintiffs in error.

Brown & Brown, Oklahoma City, for defendants in error.

BERRY, Justice.

Plaintiffs in error, plaintiffs in the trial court, brought this action to recover damages alleged to have resulted from failure of defendants, defendants in error herein, to properly develop and protect from drainage a certain undrilled location involving 20 acres in an oil field in Pawnee County, Oklahoma. A jury was waived and the cause tried to the court. At the conclusion of plaintiffs' evidence the trial court sustained defendants' demurrer thereto, and rendered judgment for defendants, from which judgment this appeal was perfected.

In view of the various parties and their unequal respective interests, we shall concern ourselves herein only with the evidence which is pertinent to the issues. The details of divisional particularity shall be disregarded. We shall refer to lessors as plaintiff, and the lessees as defendant, unless otherwise specifically designated.

A résumé of the evidence discloses that defendant acquired three oil and gas leases covering 320 acres. One lease (160 acres) covered the SE/4 of Sec. 1–20N–5E, which lease we shall designate the Privett lease. One lease covered the N/2 of the SW/4 of Sec. 6–20N–6E (80 acres) which we shall designate as the N. Keeton lease. The other lease covered the S/2 of the SW/4 of Sec. 6–20N–6E (80 acres), which we shall refer to as the S. Keeton lease. The Privett lease lies adjacent to the West of the N. and S. Keeton leases.

This action concerns a twenty-acre, undrilled location which lies adjacent on the East of the South half of the Privett lease. This undrilled location is adjacent to and South of the N. Keeton lease. We shall herein designate this undrilled location as the subject tract.

Plaintiff is the owner of a one-fourth royalty interest in the N. Keeton lease, and three-fourths royalty interest in the S. Keeton lease, but owns no interest in the Privett lease.

In October, 1955, the discovery well (Keeton No. 1) was drilled and completed on the N. Keeton lease, which directly offset the subject tract to the North. In December, 1955, the North 10 acres of the subject tract again was directly offset to the West on the Privett lease (Privett No. 1). Defendant continued development of the three leases until by July of 1956 there were five producing wells completed on the Privett lease and four producing wells completed on the N. Keeton lease, Keeton Nos. 1, 2, 3 and 6. Two producing wells were completed on the S. Keeton lease (Keeton Nos. 4 and 5). The Keeton No. 4 was completed in March, 1956. Keeton No. 5, completed in February, 1957, was a direct offset to the East of the subject tract. The Privett No. 4, a diagonal offset to the Northwest of the subject tract, was completed in November, 1956.

On October 13, 1955, the Corporation Commission entered Order No. 30,890, establishing 20-acre drilling and spacing units in an area which included both the N. and S. Keeton leases. This order designated a

drilling site in the center of the North 10 acres of the subject tract of 20 acres.

Under Order No. 31,559, the Corporation Commission, on February 1, 1956, extended the former order to include the Privett lease and made exceptions for the Keeton No. 1 and Privett No. 1 (and other wells not here mentioned), and in so doing approved of these wells being drilled off pattern.

On March 6, 1957, the Corporation Commission, by Order No. 34,293, denied defendant's application to modify Order No. 30,890, which would have permitted the subject tract to have been spaced East and West rather than North and South, and in this manner include the subject tract and Keeton No. 5 within the same 20-acre spacing unit. The Keeton No. 5, a direct offset to the subject tract to the East, had been granted an exception to spacing Order No. 30,890 on January 4, 1957. Such exception had permitted defendant to drill off pattern on this location, resulting in Keeton No. 5 being drilled on the North 10 acres rather than the South.

No appeals were taken from any of these orders.

On December 7, 1956, plaintiff's attorney wrote defendant demanding that an offset and protection well be drilled on the subject tract. Plaintiff demanded surrender of the undeveloped portion of the S. Keeton lease unless drilling operations were commenced within 30 days, and advised that plaintiff expected offset royalty within a reasonable time after completion of the offending wells. Thereafter defendant completed the Keeton No. 5 in February, 1957.

On December 30, 1960, plaintiff filed suit in the District Court of Payne County for damages resulting from breach of the implied covenants of the lease due to defendant's failure, after demand and within a reasonable time, to protect the S. Keeton lease from drainage. Plaintiff also sought damages for drainage that would occur thereafter. By amendment to the petition plaintiff alternatively alleged defendant's failure to diligently develop and operate the

lease as a prudent operator would have done.

By answer, defendant denied the Privett Nos. 1 and 4 and Keeton No. 1 produced oil in paying quantities; that defendants were mining partners; that any drainage had occurred or that plaintiff had been damaged. All material allegations were denied generally.

By pretrial agreement a jury was waived, and it was agreed the case would be tried on the question of damages from inception to the date of trial. Defendant also admitted the wells had been drilled as alleged, and that monthly production records from the Privett and both Keeton leases would be offered and that well logs on the three leases would be furnished.

Plaintiff's evidence included testimony of one of the defendants, one of the plaintiffs and the testimony of a geologist and a petroleum engineer, who testified as experts. Other evidence was supplied by exhibits which included maps, charts, production runs, well logs and other data. At the close of plaintiff's evidence a demurrer was interposed, which was sustained by the trial court. Motion for new trial was heard and overruled and plaintiff has appealed from that order.

In sustaining defendant's demurrer, the trial court expressed the opinion that, admitting everything to be true, there was no evidence to show how much drainage had been occasioned by the wells on the Privett lease. Before overruling the motion for new trial, the court briefly summarized his recollection of the evidence and stated:

"* * * I did consider the evidence as it applied to plaintiffs' theory and the defendants' theory and came to the conclusion that they had not proved substantial drainage or that a prudent operator would have drilled the well, and the word 'substantial' was the key to it."

Plaintiff urges four contentions as grounds for reversal. The third contention urges applicability of the prudent operator rule under the evidence; the fourth asserts

the evidence established a prima facie case, against which it was reversible error to sustain a demurrer. Defendant argues from the standpoint that the prudent operator rule does apply and the evidence failed to show a well should have been drilled. As we view the matter, two settled rules are dispositive of the appeal.

 The plaintiff's cause of action was founded upon allegations of damages resulting from defendant's failure and refusal to drill an offset well to the Privett and N. Keeton leases. The evidence introduced by plaintiff was directed toward establishing the facts supporting such allegations. Defendant demurred to the evidence. At this point the controlling rule is that the trial court was required to weigh the evidence in the same manner as though the cause was being tried to a jury. In C. Wallace Plumbing Co. v. Western Steel Erection Co., Okla., 380 P.2d 89, the rule, based upon our earlier cases, was stated:

"1. A demurrer to the evidence admits every fact which the evidence tends to prove in the slightest degree and all reasonable and logical inferences and conclusions therefrom.

"2. The facts that the action is one of legal cognizance and is tried to the court without a jury do not defeat the rule that a demurrer to the evidence admits facts which the evidence tends to prove in the slightest degree and all reasonable inferences therefrom when the evidence is neither conflicting, inherently improbable, nor sought to be impeached."

 Thus, the trial court was required to measure plaintiff's evidence by treating as admitted every fact which was supported in the slightest degree by proof and to extend to such evidence every reasonable inference to be drawn therefrom. The trial court's duty in this respect necessitated consideration and adherence to the second applicable rule, which was announced in Wilcox et al. v. Ryndak et al., 174 Okl. 24, 49 P.2d 733:

"1. There is no implied obligation on the part of an oil and gas lessee to drill an offset well to a well on adjoining premises, or to drill an additional well on the leased premises after oil or gas has been discovered thereon, save and except where the drilling of such well would probably, taking all of the existing facts and circumstances into consideration, produce sufficient oil to repay the cost of drilling, equipping, and operating such well, and also to produce a reasonable profit on the entire outlay, and neither the lessee nor the lessor is the arbiter of whether an offset well should be drilled or the leased premises further developed, but both are bound by what a reasonably prudent operator would do under similar circumstances, and under no circumstances will a lessee be required to drill an offset or an additional well when the same would probably not result profitably to him."

Also see Townsend v. Creekmore-Rooney Co., Okl., 358 P.2d 1103; Sunray Mid-Continent Oil Co. v. McDaniel, Okl., 361 P.2d 683.

 The rule as quoted has evolved from that announced in Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, quoted at length and adopted in Oklahoma in Indiana Oil, etc. Co. v. McCrory et al., 42 Okl. 136, 140 P. 610. In Brewster it was pointed out, by reason of conditions in the lease grant, that a lessor retains a contingent interest in the oil and gas to profitable extraction of which operations are directed. The object of such operations being to obtain profits for the lessor and lessee then, absent some stipulation to that effect, neither is the arbiter of the extent of the diligence to which, or with which, operations must proceed, and both are bound by the standard of what is reasonable. Thus no breach of the covenant to exercise reasonable diligence can occur, except where the absence of diligence is certain and substantial in view of actual circumstances existing at the time, as distinguished from the lessor's ex-

pectations and the lessee's conjecture. No obligation rests upon the lessee to carry operations beyond a point where profitable, although some benefit might result to the lessor. To the end that oil and gas shall be produced with benefit or profit to both, due diligence is required. Whether diligence has been exercised in a particular instance depends upon a variety of circumstances: (1) the quantity capable of being produced from the premises as indicated by prior exploration and development; (2) the local market or demand; (3) means of transporting to market; (4) extent and result of operations, if any, on adjacent lands; (5) character of the reservoir; (6) usages of the business. In view of these considerations what would be expected of operators of ordinary prudence is what is required.

Then, in Eastern Oil Co. v. Beatty et al., 71 Okl. 275, 177 P. 104, involving suit for cancellation, the court, upon reasoning expressed in Carper v. United Fuel Gas Co., 78 W.Va. 433, 89 S.E. 12, L.R.A. 1917A, 171, held that the obligation or covenant to protect a lessor's property could not be held to arise against permitting any drainage at all, however slight. Rather, there had to be actual or threatened drainage in a substantial sense. Then, for the first time, a qualification was engrafted upon the above enumerated circumstances: "* * * No obligation * * * should be imposed on the lessee which would probably result in a loss to him, and where the lessor *suffers no substantial pecuniary loss by such drainage. * * *"*

Application of the quoted rule requires examination of the evidence relied upon by plaintiff to establish breach of the implied covenant to prevent drainage. This evidence, elicited from two qualified expert witnesses, disclosed substantially the following matters: The Red Fork and Skinner formations underlay the North part of the subject tract and are part of a common source of supply or reservoir beneath the surface adjoining this tract on three sides. The production from the Privett and N.

and S. Keeton leases had gone into common tank batteries on each lease, so that production of different wells could not be separated, as evidence tendered by plaintiff to show total monthly production of each lease compiled from records of the Corporation Commission was excluded.

Pertinent to the issues, the geologist's (S.) testimony was that from available information and in conjunction with the petroleum engineer (W.) a map showing the structural condition of the area which had superimposed thereon "* * * an isopach of the Red Fork and Skinner Sands, the sand thicknesses, and have worked up two cross-sections that cross the property in question. * * *;". The area therein was producing from Skinner and Red Fork, which formations both were present under the subject tract, and a well drilled thereon would have been comparable to other wells. A prudent operator would have drilled the tract at the time this field was being developed, but not at the date of trial. S. testified on cross-examination as to the Red Fork and Skinner potentials under the North 10 acres of this tract, and stated he would be positive a well thereon would have been a commercial producer.

The testimony of the petroleum engineer (W.) was that he had worked with S. in the study of the area, but also had used data concerning production figures from sources other than that used by S. Based upon this study his opinion was that a well drilled on the subject tract would be comparable to performance of the offset locations. There had been 21,000 barrels of oil drained from under the subject tract between the time it should have been drilled and the trial date, and ultimately drainage would amount to 23,000 barrels. The testimony likewise reflected market prices of crude oil and completion costs of the proposed well. The witness stated, in his opinion, a prudent operator would have timely drilled the subject tract. From the ultimate 23,000 barrels to be produced 9,200 barrels would be attributed to the production from the Skinner formation.

Plaintiff's evidence further showed that the Red Fork and Skinner sands are continuous under both the Privett and Keeton leases. However, Red Fork production was obtained only from the Keeton leases, while Skinner production from both the direct offset and the diagonal offset on the Privett lease. At some point between Privett No. 1 and Keeton No. 5 the two sand formations lost their oil-bearing potentials. The testimony of both experts reveals that one or both of these formations would have produced in paying quantities if a well had been timely drilled on the subject tract.

A declared basis for the trial court's action was that while the evidence was that the subject tract had been drained by wells on the adjoining leases, there was no evidence where the oil had gone, or how much had drained to the East, and admitting that it was drained, the court did not know how much had been drained from the subject tract to the Privett lease. For purposes of passing upon defendant's demurrer, the trial court was obliged to accept as true the evidence reflecting drainage of 12,600 barrels of oil from the Red Fork formation under the 20 acres involved, and the remainder, 8,400 barrels, had been drained from the underlying Skinner formation. Since it was undisputed that Privett Nos. 1 and 4 had produced only from the Skinner formation, the evidence fairly disclosed the extent (8,400 barrels) of drainage by the Privett wells. Thus the stated conclusion as to lack of evidence to reflect how much oil had been drained from the subject tract to the Privett lease was erroneous.

Since the Keeton Nos. 1 and 5 never produced from the Skinner formation there is no basis for the claim plaintiff received all the royalty to which entitled. And, should it appear plaintiff received the royalty share from the Red Fork production drained from the subject tract, this provided no basis for the trial court's action in sustaining the demurrer.

Since this is an appeal from an order sustaining defendant's demurrer to the evidence, the rule quoted from Western Steel Erection Co., supra, requires that all the evidence and reasonable inferences to be drawn therefrom be resolved in plaintiff's favor. Neither is it proper to consider the evidence in the light of defendant's theory of the case, as was done by the trial court in resolving the question, since this amounts to nothing more than an attempt to weigh the evidence. Bush v. Middleton, Okl., 340 P.2d 474. The evidence disclosed the amount of drainage to the subject tract, the cost of an additional well, as well as cost of operations, and the expert testimony showing that had this location been timely drilled it would have been a commercial well, and demand upon defendant to protect plaintiff's tract from drainage. The evidence was uncontradicted that the Privett lease drained plaintiff's tract from Skinner production, although not clear as to which direction Red Fork production was drained.

In his oral summation the trial court expressed concern as to the inadequacy of proof to show substantial drainage. In I. T. I. O. Co. v. Haynes Drilling Co., 180 Okl. 419, 69 P.2d 624, we held in Syllabi 3 and 6:

"3. Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which, or the diligence with which, the operations shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both. Pelham Petro. Co. v. North, 78 Okl. 39, 188 P. 1069; Broswood Oil & Gas Co. et al. v. Mary Oil & Gas Co. et al., 164 Okl. 200, 23 P. (2d) 387."

"6. In an action brought to cancel that portion of an oil and gas lease being subjected to drainage by an off-set well, such portions of the lease as are being properly developed and are not being subjected to drainage will not be cancelled. However, in an equitable action where lessee has drilled in good faith but its well is shown not to have protected the whole from drainage by offsets, the court may refuse to cancel that portion of the lease not properly drained but may award the royalty owner proper damages in lieu thereof."

In Haynes, after citing Wilcox v. Ryndak, supra, we used this language (p. 626): "We reaffirm this rule as the law applying to differences between lessors and lessees with reference to offset drainage on oil and gas leases in Oklahoma." In Haynes, the trial court's judgment decreeing cancellation of a lease was reversed, but the cause was remanded to the trial court to ascertain the amount of damages accruing by reason of drainage to the portion of the lease involved. We are of the opinion the rule expressed should control herein.

Applying the reasoning in Haynes, which was a suit in equity, to the present case, we necessarily conclude plaintiff's evidence sufficiently disclosed facts supporting the claim of substantial drainage to withstand defendant's demurrer, and that the trial court erred in sustaining same. Other arguments are urged which need not be reviewed by reason of our conclusion.

The judgment of the trial court is reversed and the cause remanded for new trial.

HALLEY, C. J., and WILLIAMS, BLACKBIRD, HODGES and LAVENDER, JJ., concur.

JACKSON, V. C. J., and DAVISON and IRWIN, JJ., dissent.